[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 30, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12040
Non-Argument Calendar
_____

D. C. Docket No. 03-10024-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL FRANCISCO RAMIREZ,
LEONEL GASPAR ANGULO-QUINONES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 30, 2005)**

Before TJOFLAT, ANDERSON and BIRCH, Circuit Judges.

PER CURIAM:

Daniel Francisco Ramirez and Leonel G. Angulo-Quinones appeal their convictions and sentences for conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 46 U.S.C. §§ 1903(a),(g),(j), and 21 U.S.C. § 960(b)(1)(B), and possession with intent to distribute five or more kilograms of cocaine while onboard a vessel subject to United States jurisdiction, in violation of 46 U.S.C. § 1903(a), (g), 21 U.S.C. § 960(b)(1)(B), and 18 U.S.C. § 2. We affirm their convictions, vacate their sentences, and remand for resentencing.

## I. BACKGROUND

On May 30, 2003, the United States Navy Frigate McInerny intercepted a stranded, flagless, "go-fast" boat off the coast of Colombia. The frigate's crew observed five people, Ramirez, Angulo-Quinones, and their three co-defendants, Rafael Lopez, Omar Riascos, and Elias Santiestevan ("the defendants") on the go-fast boat, apparently trying to start the engine. The crew of the Navy frigate directed the defendants by loudspeaker to raise their hands in the air, and they complied. As a Navy boarding team approached the go-fast boat, four of the defendants, including Angulo-Quinones and Ramirez, jumped overboard into the water. Riascos remained onboard and set fire to the go-fast boat before jumping into the water himself. The crew of the frigate observed numerous packages in the center of the vessel and recovered packages floating near the sinking go-fast boat.

2

On May 31, 2003, the defendants and cocaine packages were transferred by the United States Coast Guard to the naval base at Guantanamo, Cuba. ION scans of each of the defendants indicated the presence of cocaine residue. These packages of cocaine later were determined to contain 428.1 kilograms of cocaine, with an estimated street value of well over $8,000,000.

The defendants were charged in a two-count indictment with conspiracy to possess with intent to distribute five or more kilograms of cocaine while onboard a vessel subject to United States jurisdiction, in violation of 46 U.S.C. §§ 1903(a),(g),(j), and 21 U.S.C. § 960(b)(1)(B) ("Count 1"). They also were charged with possession with intent to distribute five or more kilograms of cocaine while onboard a vessel subject to United States jurisdiction, in violation of 46 U.S.C. § 1903(a), (g), 21 U.S.C. § 960(b)(1)(B), and 18 U.S.C. § 2 ("Count 2"). Ramirez and Angulo-Quinones pled not guilty.[1]

Prior to trial, the government moved to allow the admission at trial of facts surrounding Angulo-Quinones's prior arrest on drug trafficking charges, acknowledging that Angulo-Quinones was acquitted of the charges. Specifically, the government sought to introduce evidence that, in 2000, Angulo-Quinones was arrested after being found by the Coast Guard Cutter Thetis in a stranded, flagless,

_____

[1] Lopez, Riascos, and Santiestevan entered guilty pleas to Count 1.

go-fast boat off the coast of Colombia with 2400 kilograms of cocaine floating in the water near the vessel. The government sought to introduce the evidence in order to show Angulo-Quinones's criminal intent and knowledge, planning, preparation, and absence of accident or mistake. Angulo-Quinones filed a motion in limine, requesting that the evidence of his prior arrest be excluded. The district judge reserved ruling on Angulo-Quinones's motion.

Ramirez filed a motion for severance, on the ground that a joint trial would prevent the jury from making a reliable judgment about his guilt or innocence because of the significant disparity in the government's evidence against Angulo-Quinones vis-a-vis Ramirez, and the risk of undue, spillover prejudice from the intended introduction of evidence of Angulo-Quinones's prior, similar acts. Ramirez argued that unfair prejudice would arise from evidence that Angulo-Quinones was arrested in 2000 in connection with an incident involving a stranded, flagless, go-fast boat off the coast of Colombia with four other crewmen and a substantial amount of cocaine floating in the water. The district judge denied Ramirez's motion. The district judge ultimately allowed the government to question Angulo-Quinones during cross-examination regarding the facts surrounding his 2000 arrest. The judge then instructed the jury that the information with respect to the event in 2000 could

4

not be considered concerning Ramirez and could not be considered as evidence of Angulo-Quinones's guilt in the charged offense.

Angulo-Quinones testified that he had been a fisherman his entire life. He was traveling by bus to another city to look for work, when a group of uniformed men stopped the bus and searched its passengers. The uniformed men took Angulo-Quinones's documentation identifying him as the captain of a fishing vessel and forced him and nine other men into a truck. Angulo-Quinones's captors held him under armed guard in a house for two weeks and ordered him to make a trip for them. When Angulo-Quinones refused his captors' demand, they beat him and threatened to kill his daughters until he acquiesced. His captors took him to a beach and ordered him to take a boat to a particular Colombian island, where he was to contact an individual named "Peso" by radio for final instructions on delivering the boat to Peso. R5 at 196-98. Angulo-Quinones was brought to a go-fast boat with a crew of four men that he did not know. He was the captain and operated the boat. Id. at 208, 215-17. Angulo-Quinones testified that he alerted the others to the presence of the United States Coast Guard and that he did not know any of the other crewmen on the vessel.

The government asked on cross-examination whether Angulo-Quinones had been stopped on a go-fast boat in 2000 and taken aboard the Coast Guard Cutter

5

Thetis.  He responded affirmatively.  R5 at 225-26.  When asked whether, on that same day, codefendant Santiestevan was taken aboard the Coast Guard Cutter Thetis and transported along with Angulo-Quinones to Guantanamo Bay, Cuba, Angulo-Quinones responded that he did not know.  On re-direct examination, Angulo-Quinones testified that, in 2000, Santiestevan was not on his own go-fast boat, and that he never learned the names of the others picked up by the Coast Guard.  Angulo-Quinones agreed that authorities found 2,400 pounds of cocaine floating near his boat on that occasion.  R4 at 44.  On redirect examination, Angulo-Quinones stated that there were three boats in the area at the time of his arrest in 2000, that no cocaine was found on his boat, and that he had been acquitted of all charges.

Ramirez testified that he had been a fisherman for thirty-four years, was a member of the Caribena Federation of Fishermen, and had a valid fisherman's license.  He was traveling by bus to another city to look for work, when a group of heavily armed military personnel stopped the bus in a jungle area prone to guerilla activity.  The armed individuals took Ramirez's nationality card and fisherman's documentation, and forced him into a jeep.  Ramirez testified that his captors held him in a house in the mountains for four days, before taking him to a beach, forcing him onto a boat, threatening him, and instructing him to help transport the boat.  R7 at 258-60.  Ramirez drove the go-fast boat for three to six hours.  He testified that

6

Angulo-Quinones told him in which direction to drive using a compass. Id. at 281. Ramirez further testified that Angulo-Quinones was giving directions to the four people on the boat. Id. at 278. Ramirez testified that he changed a fuel tank at Angulo-Quinones's instruction. Id. at 280.

Ramirez testified initially that he jumped into the water because the boat was on fire. The government then introduced a videotape depicting Ramirez jumping into the water when there was no fire on the boat. The government asked Ramirez if he had been detained with codefendant Riascos who pled guilty, thus informing the jury of Riascos's guilty plea in the process. R6 at 45. Ramirez's counsel had not finished enumerating all of his objections to the question, including leading, when the judge sustained it. Id.

At the close of the evidence, the district judge instructed the jury that "anything the lawyers say is not evidence in the case." R7 at 348. The court also instructed the jury that evidence of acts by Angulo-Quinones committed on another occasion and similar to the acts charged in the indictment must not be considered in deciding if Angulo-Quinones committed the acts charged in the indictment, but only to determine Angulo-Quinones's state of mind, intent, plan, preparation, accident or mistake. Id. at 350-51.

During deliberation, the jury sent the judge a written question: "Is this the fishing license a copy or original of the document taken off Ramirez at the time of the incident?" R1-87. The judge returned a written reply: "Your question has no bearing on, or connection with, any issue in this case." Id. The jury convicted Angulo-Quinones and Ramirez on both counts. Ramirez subsequently filed a motion for new trial and a motion for judgment notwithstanding the verdict. The district judge denied Ramirez's motions. The judge sentenced Ramirez to 235 months of incarceration on each count, to run concurrently, and five years of supervised release.

The probation officer prepared a pre-sentence investigation report ("PSI"), assigning Angulo-Quinones a base offense level of 38, with a two-level enhancement for being the captain of a vessel carrying a controlled substance, under U.S.S.G. § 2D1.1(b)(2)(B), and a four-level enhancement under U.S.S.G. § 3B1.1(a) for his role as an organizer or leader of a criminal activity involving more than five participants, for a total offense level of 44. Applying a criminal history category of I, the probation officer concluded that the applicable Sentencing Guidelines range was life imprisonment.

Angulo-Quinones raised several objections to the Sentencing Guidelines determination. First, he argued that the imposition of sentencing enhancements

8

under U.S.S.G. §§ 3B1.1(a) for being an organizer/leader was improper because any leadership activities that he performed were related to the operation of the vessel as captain. At the sentencing hearing, Angulo-Quinones clarified that the application of both U.S.S.G. §§ 3B1.1(a) for being an organizer/leader, and 2D1.1(b)(2)(B) for being a captain/navigator, would constitute improper double-counting. Angulo-Quinones also objected that the government had not shown that he was importing or exporting the drugs while serving as captain of the vessel, because there was no showing of import or export. He contended that he was no more culpable than his codefendants who engaged in identical conduct but entered guilty pleas and received sentences significantly lower than 360 months of incarceration.

The district judge rejected Angulo-Quinones's double-counting argument and found that caselaw supported the government's argument that the application of both U.S.S.G. §§ 3B1.1 (organizer/leader) and 2D1.1(captain/navigator) does not constitute double-counting. Nonetheless, the judge imposed only a two-level enhancement under U.S.S.G. § 3B1.1(c), rather than the four-level enhancement recommended by the probation officer under § 3B1.1(a). The judge expressed dissatisfaction with the Sentencing Guidelines as applied in Angulo-Quinones's case because he lacked the discretion to take Angulo-Quinones's age into account, such that the 360-month sentence at the bottom of the Sentencing Guidelines range was

effectively a life sentence. The judge sentenced Angulo-Quinones to 360 months of incarceration and five years of supervised release. Both Ramirez and Angulo-Quinones appeal their convictions and sentences.

## II. DISCUSSION

A. Sufficiency of the Evidence to Support Ramirez's Convictions

On appeal, Ramirez argues that the evidence was insufficient to support his convictions. Specifically, he asserts that there was no evidence that he had specific intent to join the conspiracy, because his association with the conspirators was the result of his abduction or coercion. Ramirez maintains that he never agreed to participate in the conspiracy and that the verdict was the result of mere speculation based on his codefendants' criminal histories. He emphasizes that the evidence showed that he did not know the other people on the go-fast vessel. Ramirez argues that he did not knowingly and willfully possess with intent to distribute the cocaine because he did not know that the cocaine was on the vessel, participate in loading the cocaine on the vessel, or have a means of escaping the vessel in open seas. Accordingly, Ramirez argues that the evidence was insufficient to support his convictions because he lacked the requisite intent to commit either offense, and because he never had control of the cocaine for purposes of establishing actual or constructive possession.

10

We review "sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Trujillo, 146 F.3d 838, 845 (11th Cir. 1998). The evidence need not exclude every hypothesis of innocence or be completely inconsistent with every conclusion other than guilt because a jury may select among constructions of the evidence. United States v. Hardy, 895 F.2d 1331, 1334 (11th Cir. 1990). Pursuant to 46 U.S.C. § 1903(a), it is unlawful for a person on board a vessel subject to the jurisdiction of the United States "to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 1903(a). Moreover, "[a]ny person who attempts or conspires to commit any offense defined in [Title 46, Chapter 38, Maritime Drug Law Enforcement] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 46 U.S.C. § 1903(j).

We have recognized that a large quantity of illicit drugs on a small vessel supports a jury's inference that the persons onboard the vessel were not "unaffiliated bystanders." United States v. Cruz-Valdez, 773 F.2d 1541, 1546-47 (11th Cir. 1985). We enumerated other factors which can support a jury's finding of participation in a drug trafficking conspiracy, including the length of the voyage, the relationship

11

between the captain and crew, "suspicious behavior or diversionary maneuvers before apprehension, an attempt to flee, inculpatory statements made after apprehension, witnessed participation as a crewman, whether the contraband was obvious, and the absence of supplies or equipment necessary to the vessel's intended use." Id. at 1547. Significantly, where "the presence of the large quantity of [contraband] was clear and uncontested, the proof required to establish the existence of a conspiracy and [the defendant's] participation in it would also suffice to prove his possession of the [contraband]." Id. at 1544.

There is sufficient evidence to support Ramirez's conspiracy and possession convictions. There were only five crew members. The estimated value of the cocaine was approximately $8,000,000. The cocaine packages were visible on the boat, which had no other cargo. The approach of the Coast Guard boarding team prompted Ramirez and the other crew members to leap into rough seas while flames overtook their abandoned vessel. Additionally, Ramirez modified his account of when he leapt from the vessel when confronted with a videotape of that event. Based on the reasoning set forth in Cruz-Valdez, the evidence in this case is sufficient to support Ramirez's convictions.

B. Denial of Ramirez's Motion for Severance

12

Ramirez argues that the district judge abused his discretion by denying his motion for severance because he was unfairly prejudiced by "spillover" from evidence of Angulo-Quinones and codefendant Santiestevan's prior, extrinsic acts relating to their arrest for drug trafficking in 2000. See Fed. R. Crim. P. 404(b). He contends that evidence of Angulo-Quinones's knowledge of the scheme and criminal intent prejudiced Ramirez's defenses of lack of knowledge and criminal intent. Ramirez argues that the admission of the Rule 404(b) evidence created an improper inference of guilt by association.

The denial of a motion to sever is reviewed for abuse of discretion. United States v. Walser, 3 F.3d 380, 385 (11th Cir.1993). "We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection." Id. A defendant can show compelling prejudice by demonstrating "that the jury was unable to sift through the evidence and 'make an individualized determination as to each defendant.'" United States v. Schlei, 122 F.3d 944, 983 (11th Cir. 1997) (citation omitted). A jury is presumed to follow the instructions given to it by the district judge. United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir.1996). "This court is reluctant to reverse a district court's denial of severance, particularly in conspiracy

cases, as generally 'persons who are charged together should also be tried together.'" United States v. Knowles, 66 F.3d 1146, 1158 (11th Cir.1995) (citation omitted).

The district judge's denial of Ramirez's motion for severance did not constitute a clear abuse of discretion. Ramirez did not meet his burden to show compelling prejudice: that the judge's first limiting instruction to the jury, regarding the evidence of Quinones's prior acts and their lack of relevance to Ramirez, was ineffectual; or that the jury could not make an individualized determination as to his guilt or innocence. Any potential prejudice to Ramirez from admission of the evidence regarding Quinones and Santiestevan's arrest in 2000 was mitigated by the judge's limiting instruction to the jury and Ramirez's own defense testimony that he had no prior acquaintance with Angulo-Quinones or Santiestevan before the incident at issue.

C. Denial of Ramirez's Motion for Mistrial

Ramirez asserts that the district judge abused his discretion by denying his motion for a mistrial because the cumulative errors prejudiced his right to a fair trial. Specifically, Ramirez argues that the prosecutor's disclosure to the jury that codefendant Riascos had entered a guilty plea was highly prejudicial, irrelevant, and non-probative. He also contends that the district judge abused his discretion when he advised the jury that their question concerning his fisherman's license had no

14

bearing on or connection with any issue in the case. Ramirez contends that the district judge's answer improperly suggested that his exhibit was not relevant and, consequently, invaded the province of the jury. He emphasizes that whether the license was taken from him by authorities was relevant to corroborate or discredit his defense testimony that his kidnappers seized his fisherman's documentation. Finally, he reiterates his argument that he was prejudiced by spillover from improper Rule 404(b) evidence of Angulo-Quinones and Santiestevan's prior arrest.

We review a district's denial of a motion for mistrial for abuse of discretion. Trujillo, 146 F.3d at 845. "We have held that the 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995). "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490 (1953); United States v. Adams, 74 F.3d 1093, 1099-1100 (11th Cir. 1996). We also have recognized that "errors were made but the substantial rights of the Defendants were not affected by those errors because properly admitted evidence sufficiently established their guilt." Adams, 74 F.3d at 1100.

The district judge did not abuse his discretion when he denied Ramirez's request for a new trial. As we have explained, properly admitted evidence

15

sufficiently established Ramirez's guilt. The district judge correctly sustained Ramirez's objection to the prosecutor's question concerning Riascos's guilty plea. Consequently, there was no testimony on that issue. Moreover, the judge expressly instructed the jury at the close of the evidence that "anything the lawyers say is not evidence in the case." R7 at 348. Ramirez's reading of the judge's response to the jury question is overly broad. The judge did not direct the jury to disregard the already admitted fishing license; he informed them that it was irrelevant whether the exhibit submitted to the jury was an original or copy of the document, when the authenticity of the document had not been challenged. Additionally, the evidence of Angulo-Quinones's prior arrest was properly admitted and any potential prejudice to Ramirez was mitigated by the judge's limiting instruction. Therefore, the district judge did not abuse his discretion by denying Ramirez's motion for mistrial.

D. Admission of Angulo-Quinones's Prior Arrest

Angulo-Quinones argues that the trial court improperly admitted evidence relating to authorities' discovery of 2,400 pounds of cocaine in the area of Angulo-Quinones's vessel when he was arrested in 2000. He contends that this disclosure was inadmissible propensity evidence under Federal Rule of Evidence 404(b). Angulo-Quinones asserts that the prejudicial impact of improper propensity evidence outweighed its probative, impeachment value on a collateral issue. With respect to

16

the probative value of the evidence, Angulo-Quinones argues that the fact that the same Coast Guard Cutter picked up Angulo-Quinones, Santiestevan,[2] and others on different go-fast vessels on the same day does not disprove Angulo-Quinones's testimony that he did not know Santiestevan prior to the instant case.   Angulo-Quinones maintains that the disclosure of the 2,400 pounds of cocaine near his vessel in 2000 was not necessary in order to impeach him regarding his failure to recall meeting Santiestevan.

We review the district court's admission of prior crimes or bad acts under Federal Rule of Evidence 404(b) for abuse of discretion.  United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir. 1993).  Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).  In determining whether evidence is admissible under Rule 404(b), we apply a three part test: "'(1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; (3) the government must offer sufficient proof so

---

[2]  Quinones's brief refers to Santiestevan as "Santes Estaban."

that the jury could find that defendant committed the act.'" Hogan, 986 F.2d at 1373 (citation omitted). A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense. Id. at 1374.

The district judge did not abuse his discretion by admitting the evidence relating to authorities' 2000 arrest of Angulo-Quinones and discovery of large quantities of cocaine near his vessel at the time of the arrest. Regarding the first step in our determination of the admissibility of such evidence, the evidence is relevant to an issue other than Angulo-Quinones's character, namely the truthfulness of his testimony that he had no prior acquaintance with his codefendant, and Angulo-Quinones's knowledge of the use of go-fast boats in the transport of large quantities of cocaine. With respect to the second step of our analysis, the evidence is also probative. Although the presence of Angulo-Quinones and one of his codefendants in the same place at the same time under similar circumstances in 2000 does not conclusively establish that they met, the evidence makes such a meeting appear more probable. The evidence further is probative of Angulo-Quinones's criminal intent because it makes it appear more probable that he knew the object of the charged conspiracy. The similarity of circumstances in which Angulo-Quinones found himself, apprehended off the Colombian coast in a flagless, go-fast boat surrounded

18

by large quantities of cocaine is highly probative of his criminal intent.  See id. ("The similarity between the two crimes and the facts relating thereto make the former conviction highly probative of [the defendant's] intent").  Moreover, the risk of undue prejudice to Angulo-Quinones was reduced by the court's limiting instruction.  Therefore, the district judge did not abuse his discretion by admitting the evidence relating to authorities' 2000 arrest of Angulo-Quinones and discovery of large quantities of cocaine near his vessel at the time of the arrest because the probative value of the evidence outweighed the risk of undue prejudice to Angulo-Quinones.

E. Angulo-Quinones's Enhancements for Being Leader of the Conspiracy and Captain of the Vessel

Angulo-Quinones argues that the district judge misapplied the Sentencing Guidelines by enhancing his sentence under both U.S.S.G. § 2D1.1(b)(2)(B), for being the captain of a vessel carrying a controlled substance, and U.S.S.G. § 3B1.1, for being the organizer or leader of criminal activity.  He contends that application of both enhancements constituted double-counting in violation of the Double Jeopardy Clause.  We review allegations of impermissible double counting de novo.  United States v. Rendon, 354 F.3d 1320, 1333 (11th Cir. 2003), cert. denied, 541 U.S. 1035, 124 S.Ct. 2110 (2004).

The two-level enhancement under § 2D1.1(b)(2)(B) is imposed when "'the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other

19

operation officer aboard <u>any craft or vessel</u> carrying a controlled substance.'" <u>Id.</u> at 1330 (quoting U.S.S.G. § 2D1.1(b)(2)(B)). There is no dispute that Angulo-Quinones was sought to captain the subject go-fast boat because he possessed documentation identifying him as the captain of a fishing vessel and that he was the captain and operated the boat. The evidence showed that the go-fast boat was being used to transport a substantial amount of cocaine into the United States when it was intercepted by the Navy frigate. Consequently, the application of the two-level enhancement for being captain of the subject go-fast boat was appropriately included in calculating Angulo-Quinones's sentence.

A defendant's role as an organizer or leader is a factual finding that we review for clear error to determine if the enhancement under § 3B1.1 was applied appropriately. <u>Id.</u> at 1331. The factors that a sentencing court considers to decide if this enhancement is applicable are: "'(1) exercise of decision-making authority, (2) nature of participation in the commission of the offense, (3) recruitment of accomplices, (4) claimed right to a larger share of the fruits of the crime, (5) degree of participation in planning or organizing the offense, (6) nature and scope of the illegal activity, and (7) degree of control and authority exercised over others.'" <u>Id.</u> at 1331-32 (citation omitted). The sentencing judge gave Angulo-Quinones a two-level enhancement for being an organizer/leader, the least possible upward adjustment in

20

offense level under § 3B1.1, despite the probation officer's recommending a four-level enhancement in Angulo-Quinones's PSI. See U.S.S.G. § 3B1.1(c).[3] Significantly, "[w]e have recognized that '[t]he defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines' and that '[b]ecause the district court must interpret the factors stated in the commentary, and must exercise its best judgment as to the application of the facts to these standards, its decision is entitled to one of deference on appeal.'" Rendon, 354 F.3d at 1332 (citation omitted) (alterations in original). We also have upheld a § 3B1.1 enhancement when the convicted defendant "had decision-making authority and exercised control." United States v. Suarez, 313 F.3d 1287, 1294 (11th Cir. 2002), cert. denied, 540 U.S. 828, 124 S.Ct. 55 (2003).

Angulo-Quinones not only was captain of the go-fast boat, but also he knew the destination of the boat for delivery of the cocaine, which was not a destination of his choosing. He was following the instructions of the drug dealers as to the delivery, and he was charged with calling Peso to deliver the boat and its cargo upon arrival at the appointed destination. He also was in charge of his four codefendants on the go-

---

[3] Section 3B1.1(c) does not specify a particular number of participants that an organizer/leader must have supervised for the two-level enhancement to attach, while § 3B1.1(a) requires organization or leadership over "five or more participants or was otherwise extensive" for a four-level enhancement. U.S.S.G. § 3B1.1(a).

21

fast boat and oversaw Ramirez while he drove the go-fast boat for three to six hours as well as directed Ramirez to change a fuel tank. In addition to giving orders to the four codefendants on the go-fast boat, Angulo-Quinones alerted his codefendants to the presence the Coast Guard.

Angulo-Quinones attempts to distinguish <u>Rendon</u>, where we upheld sentencing enhancements under both § 2D1.1(b)(2)(B) and § 3B1.1, on the facts by contending that Angulo-Quinones's activities on the go-fast boat were related only to his being the captain. We have recounted his conduct that showed him to be in charge of his codefendants and acting as an organizer and leader under direction of the drug dealers in addition to being the captain. Importantly, <u>Rendon</u> does not hold that the specific facts of that case are required for enhancements under §§ 2D1.1(b)(2)(B) and 3B1.1 to be applicable. To the contrary, <u>Rendon</u> provides various factual considerations for the sentencing court in deciding whether a § 3B1.1 enhancement is applicable, such as nature of participation in the criminal conduct, scope of the criminal activity, and "degree of control and authority exercised over others," which are applicable in this case. <u>Rendon</u>, 354 F.3d at 1332. There is no requirement that all the considerations have to be present in any one case. Rather, <u>Rendon</u> makes clear that these factors are merely considerations for the sentencing judge, who makes the factual determinations for the applicability of the § 3B1.1 enhancement on a case-by-case basis, and we give

22

deference to the factfindings of the sentencing judge.  Accordingly, parsing the specific facts of <u>Rendon</u> cannot overcome the governing law that permits various factual situations to show an organizer/leadership role.

With respect to double counting, <u>Rendon</u> did hold that enhancements under §§ 2D1.1(b)(2)(B) and 3B1.1 "are not mutually exclusive enhancements under the Sentencing Guidelines."  <u>Id.</u> at 1334.  "[T]he two enhancements embody 'conceptually separate notions relating to sentencing' because they are designed for two different purposes," and "[n]either of the challenged guidelines includes any language or commentary that suggests that they may not be applied cumulatively." <u>Id.</u>  During the discussion of potential double counting among the judge and both counsel at Angulo-Quinones's sentencing, his counsel conceded that he could not distinguish <u>Rendon</u>, which resulted in his objection to Angulo-Quinones's enhancements under §§ 2D1.1(b)(2)(B) and 3B1.1 being overruled.[4]  We conclude

---

[4] The following exchange occurred at Angulo-Quinones's sentencing regarding double counting with the resulting recognition that <u>Rendon</u> was dispositive:

> MR. ABRAMS [Angulo-Quinones's counsel]: And so there's a question about a role adjustment under 3B1.2, I believe, or 1.1, and then there is a also, under 2D1.1, an enhancement because he was the operator, the captain of a vessel involving the import or export of a controlled substance.

that the sentencing judge correctly determined that <u>Rendon</u> controls Angulo-

Quinones's double-counting challenge.  In confirming the appropriateness of both of

these sentencing enhancements, we note that the judge considered the request of

Angulo-Quinones's counsel that he be given the lowest, or two-level instead of the

---

THE COURT: Now I recall.  That's one thing that did bother me, Ms. Selmore [AUSA].  It seems like double penalty, if you will.

MS. SELMORE: Your Honor, as I laid out in my response, and I believe I cited an Eleventh Circuit decision to you, the decision of <u>United States versus Rendon</u>, it was a case decided recently, actually in December of this year.

THE COURT: Refresh my recollection.  What I want to know is, is that case on point?

MS. SELMORE: It's directly on point, Your Honor.

THE COURT: Directly?

MS. SELMORE: Directly.

THE COURT: What was the holding?

MS. SELMORE: The holding was that under the guidelines it is not considered double counting for the defendant to receive the enhancement for being a captain as well as a leader/organizer.  There is no provision in the guidelines stating that you cannot apply both of those enhancements.  Basically, the Court concluded that it was totally proper that both enhancement[s] apply in a factual pattern exactly like this one.  It was a Title 46 case in which the defendant in that case was stopped on the high seas —

THE COURT: I recall that now.  You read that; can you distinguish it, Mr. Abrams?  Be candid.

MR. ABRAMS: <u>No, sir</u>.

THE COURT: I like your professionalism.  I couldn't either, having that refresh my recollection.  That objection will be overruled.

R8 at 3-4 (emphasis added).

24

four-level enhancement, under § 3B1.1 and determined that was the appropriate enhancement.[5] <u>Compare</u> § 3B1.1(a) <u>with</u> § 3B1.1(c). While we have determined that the enhancements under §§ 2D1.1(b)(2)(B) and 3B1.1 were appropriately applied and that the district judge did exercise discretion in sentencing at the lowest level of enhancement, we nevertheless permit the judge to revisit this aspect of Angulo-Quinones's sentence pursuant to our remand for resentencing under <u>United States v. Booker</u>, 543 U.S. __, 125 S.Ct. 738 (2005), as we explain in the following section addressing plain-error analysis. While the enhancement for being captain of the go-fast boat and being an organizer/leader is applicable to Angulo-Quinones for his conduct in the attempted importation of the subject cocaine, we cannot be certain that the district judge would have given Angulo-Quinones these enhancements following <u>Booker</u>, and we want him to revisit these enhancements for Angulo-Quinones when

---

[5] The sentencing discussion concerning the § 3B1.1 enhancement continued as follows:

> MR. ABRAMS: Judge, can I just ask, just in a matter of points, with respect to the leadership role, the PSI assigned a four-level enhancement to the leadership role and one of the items that we requested, based on the facts of this case, was that Your Honor consider just applying a two-level enhancement for role if Your Honor found a leadership role to be appropriate.
>
> THE COURT: Yes. I am going to do that. I recall that now. That would give us a two-level reduction. That would then avoid the life term.
>
> MR. ABRAMS: Yes, sir.

R8 at 7.

25

he resentences Angulo-Quinones and Ramirez on remand for the amount or weight of cocaine involved, which we explain in the next section.

F. Plain-Error Analysis

Among Angulo-Quinones's appellate issues was that his sentence enhancements violated his Sixth Amendment rights because they were neither charged in the indictment or proved to a jury, and he relied on Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004). These alleged unconstitutional enhancements were his enhancements for being captain of the go-fast boat, being an organizer/leader, and the amount of cocaine involved. Originally, Ramirez certified to this court that no issue regarding sentencing would be raised in his appeal, and his sentencing proceeding was not transcribed. Subsequently, Ramirez moved to adopt Angulo-Quinones's sentencing issues, the only one of which applied to him was the amount of cocaine involved. We ordered that Ramirez's sentencing proceeding be transcribed so that we could review it.

Additionally, the Supreme Court decided Booker, which extends Blakely, and holds that the Sixth Amendment is violated when a sentencing judge enhances a sentence based on facts found by the judge under Sentencing Guidelines believed to be mandatory, and those facts were not admitted by the convicted defendant or found by the jury. Following Booker, our court issued United States v. Rodriguez, 398 F.3d

26

1291(11th Cir.), cert. denied, __ U.S. __, 125 S.Ct. 2935 ( 2005).  In Rodriguez, we recognized that plain-error analysis governs our review of alleged sentencing errors such as Angulo-Quinones and Rodriguez raise in this appeal because their objections were not made in district court.  Id. at 1298.  Under this review standard, we cannot correct an error that the convicted defendant failed to raise in district court, unless it is "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" Id. (citation omitted).  If all of these conditions are satisfied, then we have discretion to address a forfeited error "'only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (citation omitted).  Concerning the third part of the plain-error analysis, the defendant has the burden of persuasion as to prejudice resulting from the challenged sentencing error.  Id. at 1299.

After Booker issued, counsel for Angulo-Quinones and the government asked this court to vacate his sentence under the Sentencing Guidelines because the sentencing judge stated that he was bound by the Sentencing Guidelines to give Angulo-Quinones a sentence that he did not want to give him.  Based on the judge's comments at sentencing, the government stated that Angulo-Quinones can demonstrate the third part of the plain-error analysis and arguably can substantiate the fourth part of the analysis by showing an error that affected the fairness, integrity, or public reputation of the sentencing proceedings.  Therefore, the government agreed

27

that a remand is warranted to give the district judge the opportunity to reconsider

Angulo-Quinones's sentence under <u>Booker</u>.  Consequently, the government stated

that Angulo-Quinones's sentence evidenced constitutional error in violation of the

Sixth Amendment as well as statutory error resulting from the sentencing judge's

mistaken belief that the Sentencing Guidelines were mandatory instead of advisory,

as <u>Booker</u> holds.  Our review of Angulo-Quinones's sentencing transcript reveals the

judge's explicit view that the Sentencing Guidelines were mandatory:

> Well, let me make one observation, and I make it for whoever reads this, for their benefit as well, and I include the members of the Eleventh Circuit, the judicial members of that Court of Appeal.
> If ever there was form over substance, that disagreement is a prime example here.  We're looking at a defendant who is 62 years of age.  I have a feeling that even if I gave him less than 360 months, whatever I would give him would, for all practical purposes, probably be life, for the probabilities are great that he will leave this life while still in prison.  <u>Very candidly, if I had any discretion in this matter, that age would make a difference in my sentencing, but again, I'm also reminded that members of Congress, including Mr. Feeney, would take what little discretion we have away from us so that we have none.</u>
> Very well. I will not invite argument for obviously I will sentence the defendant at what is now the low end of the guidelines.
>     . . . .
> . . . . Mr. [Angulo-]Quinones, let me advise you that your use of the term "fair" unfortunately will play no part in the sentence that I will impose, for <u>my opinion counts as nothing in these proceedings.  We have what are known as sentencing guidelines and I must accept those guidelines whether I agree with them or not, for if I fail to do so then I would be violating the law.</u>
> <u>Let me assure you that if I had discretion in this matter, the probabilities are great that you would realize your wish, that is, to be among those who are near and dear to you and who perhaps need your</u>

presence, but again, I point out that under our system I don't have that kind of discretion.

. . . .

I think it probably is only appropriate to tell you, in my conference with the probation officer in this case, who is charged with the responsibility of preparing a report for this Court which included your background, matters about your family and things of that nature, I advised the probation officer that if I could, I would send you back to Colombia because the term that I will have to impose upon you, unless some higher authority intervenes, will essentially mean that you will probably never go back to your homeland again, and as I advised the probation officer, that seems to me to be a great waste, not so much from the standpoint of compassion for you, but because of the expense, the fantastic sum of money that it is going to cost to take care of you, feed you for the rest of your life probably. In any event, I wish you well.

R8 at 8-9, 11-12 (emphasis added).

Similarly, in sentencing Ramirez, the district judge stated in response to the government's informing that a sentence at the low end of the Sentencing Guidelines would not be opposed:

Very well. Thank you, Ms. Selmore. Well, that's one of the matters that makes our system of sentencing quite severe. I would consider the age of the defendant as well as the no prior convictions. Unfortunately, in controlled substances, in most instances it's the weight that largely determines the sentence.

. . . .

Well, obviously the Court will indeed sentence this defendant at the low end of the guideline range.

2d Supp. R. 1 at 3-4.

Therefore, we vacate both Angulo-Quinones and Ramirez's sentences as to the amount or weight of cocaine involved and remand for resentencing under Booker

29

permitting the sentencing judge to use the Sentencing Guidelines as advisory rather than as mandatory. Nonetheless, the district judge on remand is required "to take account of the Guidelines together with other sentencing goals." Booker, 543 U.S. at __, 125 S.Ct. at 764 (citing 18 U.S.C. § 3553(a)). As we explained in the preceding section addressing Angulo-Quinones's enhancements under §§ 2D1.1(b)(2)(B) and 3B1.1, while we conclude that they were applied appropriately, the district judge may revisit those enhancements to Angulo-Quinones's sentence under Booker on this remand for resentencing.

### III. CONCLUSION

Angulo-Quinones and Ramirez have raised various issues relating to their conviction and sentencing for their participation in the attempted importation of cocaine into the United States. As we have explained herein, their appellate issues concerning their convictions are **AFFIRMED**. Their sentences, however, are **VACATED** and **REMANDED** for the limited purpose of resentencing in view of Booker.

30