[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13503
Non-Argument Calendar
_____

D.C. Docket No. 3:16-cr-00003-TCB-RGV-24


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TONIA WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 15, 2018)

Before JORDAN, JILL PRYOR and HULL, Circuit Judges.

PER CURIAM:

Tonia Williams appeals her conviction for attempting to distribute methamphetamine and cocaine; she also appeals her sentence. She contends that the district court should have dismissed the indictment because the government's conduct in carrying out the reverse sting operation in this case was outrageous and violated her constitutional rights. She also challenges the court's application of a two-level sentencing enhancement based on her supervisory role in the criminal activity. After careful review, we affirm Williams's conviction, vacate her sentence, and remand for resentencing.

## I.    FACTUAL BACKGROUND

### A.    Williams's Criminal Offense

This case arises out of an FBI investigation into Georgia prison guards who were smuggling contraband into state prisons. The FBI eventually redirected the investigation into guards' conduct occurring outside prisons. The FBI created a reverse sting operation in which a confidential human source ("CHS") posed as a high-level drug trafficker and asked prison guards to assist him in transporting methamphetamine and cocaine to other purported drug traffickers. The guards were told to wear their uniforms during the transactions to protect the drug deals from law enforcement interdiction. The CHS paid the guards for their assistance.

Williams, a corrections officer with the Georgia Department of Corrections, was arrested in the reverse sting operation. Another prison guard, co-defendant

2

Travonne Ferrell, approached Williams about participating in the scheme. Although she initially declined, Williams agreed and assisted the CHS on three occasions in transporting substances that she believed to be methamphetamine and cocaine. For each transaction, Williams wore her guard uniform. She was given the opportunity to back out before each transaction but opted to participate.

In the first transaction, Ferrell and Williams met the CHS in a parking lot in Locust Grove, Georgia. When Ferrell and Williams entered the CHS's vehicle, he told them that they would be delivering three kilograms of methamphetamine and three kilograms of cocaine to Stockbridge, Georgia.[1] The CHS explained that Williams would ride with the CHS and transport the cocaine while Ferrell would follow in his own vehicle and transport the methamphetamine. When they arrived at the parking lot in Stockbridge, Ferrell and Williams placed bags containing the drugs in another vehicle. The CHS paid Williams $1,500 for her assistance.

While driving to Stockbridge, Williams told the CHS that she knew two other prison guards who might want to assist in transporting drugs. Williams later sent the CHS text messages containing the phone numbers for two guards, Phoenicia Minor and Tacowan Fluellen.

---

[1] For each of the transactions, the packages the CHS gave Williams contained counterfeit methamphetamine and cocaine. We nonetheless refer to the substances as methamphetamine, cocaine, or drugs for ease of reference.

3

In the second transaction, Williams and Minor met the CHS in a parking lot in Locust Grove. The CHS gave Williams a bag containing three kilograms of cocaine and Minor a bag with two kilograms of methamphetamine. The CHS drove to Stockbridge with Minor in his vehicle, while Williams followed in her vehicle. When they arrived at a parking lot in Stockbridge, Williams and Minor placed the bags containing the drugs in another vehicle. This time Williams was paid $3,000.

Williams and Fluellen participated in the third transaction. They met the CHS in a parking lot in Locust Grove. When they entered the CHS's vehicle, he instructed them that they each would transport a bag containing two kilograms of cocaine and one kilogram of methamphetamine. The CHS drove to Stockbridge with Fluellen in the CHS's vehicle, while Williams followed in her vehicle. When they arrived at the parking lot in Stockbridge, Williams and Fluellen placed the bags containing the drugs in another vehicle. The CHS again paid Williams $3,000. This was the last transaction in which Williams participated.

The government indicted Williams and more than 20 other prison guards who assisted the CHS in similar drug transactions. A grand jury changed Williams with three counts of attempting to distribute methamphetamine and cocaine, in violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2, and three counts of

4

affecting commerce by extortion under color of official rights, in violation of 18 U.S.C. § 1951(a).

Williams moved to dismiss the indictment, claiming that the government engaged in outrageous conduct and violated concepts of fundamental fairness by creating a reverse sting operation that targeted individuals who had not previously engaged in illegal conduct. A magistrate judge recommended that the district court deny her motion. Williams objected to the magistrate judge's recommendation. The district court overruled the objection and denied the motion to dismiss.

After the district court denied her motion to dismiss, Williams pled guilty to one count of attempting to distribute methamphetamine and cocaine. At the plea hearing, the government described how Williams had transported what she believed to be a total of eight kilograms of cocaine and one kilogram of methamphetamine in exchange for cash. The government also explained that Williams was told and believed that her uniformed presence would protect the drug deals by making it less likely that law enforcement officers would search her vehicle if there was a stop. Williams agreed with the government's description of her conduct.

## B.    Williams's Sentencing

After Williams pled guilty, the probation office prepared a presentence investigation report ("PSI"). Based on the drug quantity, the PSI calculated

5

Williams's base offense level as 34.  The PSI applied a two-level enhancement based on Williams's role as an "organizer, leader, manager, or supervisor" of the criminal activity.  U.S.S.G. § 3B1.1(c).  The PSI explained that the supervisory role enhancement was warranted because Williams recruited Fluellen to participate in the scheme.  After applying an additional two-level enhancement for abusing a position of public trust and a three-level reduction for acceptance of responsibility, the PSI found that Williams's total offense level was 35.  The PSI calculated that this total offense level and Williams's criminal history category of I yielded a recommended range under the Sentencing Guidelines of 168-210 months of imprisonment.  The PSI noted that a downward departure or variance could be warranted to avoid sentencing disparities with Williams's similarly situated co-defendants who received sentences significantly below their Guidelines ranges.

Before sentencing, Williams objected to, among other things, the PSI's base offense level and the supervisory role enhancement.  Regarding the base offense level, she challenged the quantity of drugs that the PSI attributed to her and asserted that under the correct quantity, her base offense level was 32. The government agreed.

Regarding the supervisory role enhancement, Williams argued that, by itself, her recruitment of Fluellen was not a basis for imposing the enhancement and that there was no evidence that she exerted any control, influence, or decision-making

6

authority over the scheme.  She also argued that she was entitled to a two-level reduction in her offense level under the Guidelines' "safety valve" provision.  *See* U.S.S.G. §§ 2D1.1(b)(17), 5C1.2.  But Williams acknowledged that she was eligible for this reduction only if the district court found that she should not receive the two-level supervisory role enhancement.  The government argued that the supervisory role enhancement was warranted because Williams recruited Fluellen and Minor to the scheme.  The government explained that under binding precedent recruiting an accomplice was sufficient to warrant a role enhancement.

At the sentencing hearing, the district court adopted the PSI's unobjected-to findings of facts and conclusions of law.  The court found that Williams's base offense level was 32.  The district court then considered whether to apply the supervisory role enhancement.  To support the enhancement, the government introduced evidence showing that Williams asked Minor to participate in the scheme and connected the CHS with Minor.  After considering the parties' arguments, the court indicated that it was not "completely convinced that it is fair" to apply the enhancement, but that binding precedent required it to apply the enhancement.  Doc. 819 at 17.[2]  The district court stated, "[I]f I were to find that [Williams] was not subject to a role enhancement, I would be reversed."  *Id.*

---

[2] Citations in the form "Doc. #" refer to numbered entries on the district court's docket.

After considering the other adjustments to Williams's offense level, the court found that Williams's total offense level was 33. This offense level combined with her criminal history category of I resulted in a Guidelines range of 135 to 168 months of imprisonment. After hearing arguments and allocution, the court varied downward and sentenced Williams to 61 months' imprisonment. This is Williams's appeal.

## II.    STANDARDS OF REVIEW

We review *de novo* a claim that a defendant was denied process of law based upon outrageous conduct by the government. *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993). A challenge to the application of the Sentencing Guidelines is a mixed question of law and fact. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). We review the district court's findings of facts for clear error and its application of the Guidelines to those facts *de novo*. *Id.*

## III.    ANALYSIS

Williams raises two arguments on appeal. First, she argues that the district court erred in denying her motion to dismiss the indictment. She contends that the district court should have dismissed the charges against her because, in conducting the reverse sting operation, the government engaged in outrageous conduct that violated fundamental principles of due process. Second, she contends that the

8

district court erred when it applied a two-level supervisory role enhancement at sentencing.  We consider these arguments in turn.

## A.    The District Court Did Not Err in Denying Williams's Motion to Dismiss the Indictment.

Williams argues that the government engaged in outrageous conduct and violated her due process rights when it created a reverse-sting operation that targeted low-paid prison guards, who were not engaged in ongoing criminal activity, with the allure of substantial cash payments for breaking the law. Although the government's conduct here was questionable, we cannot say that it meets the very high standard for outrageous conduct to constitute a due process violation.[3]

The Supreme Court has said that "the conduct of law enforcement agents [may be] so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973).  The outrageous conduct defense "focuses on the tactics employed by law enforcement officials to obtain a

---

[3] The government argues that Williams may not challenge the denial of her motion to dismiss the indictment because she subsequently pled guilty.  It is true that entering a guilty plea generally "waives a defendant's right to all non-jurisdictional challenges to a conviction." *United States v. Bonilla*, 579 F.3d 1233, 1240 (11th Cir. 2009).  But "[t]here are . . . a few exceptions to this rule." *Id.*  A defendant's guilty plea "establishes factual guilt" of the charged offense, "and therefore all constitutional violations which are inconsistent with that factual guilt are waived by a guilty plea." *Id.*  But a plea of guilty "'does not waive a claim that judged on its face the charge is one which the [government] may not constitutionally prosecute.'" *Id.* (quoting *Menna v. New York*, 423 U.S. 61, 62 n.2 (1975)).  We assume for purposes of this appeal that Williams did not waive her outrageous conduct defense by pleading guilty.

conviction for conduct beyond the defendant's predisposition." *United States v. Sanchez,* 138 F.3d 1410, 1413 (11th Cir. 1998). In considering this defense, we ask whether the government's "methods comport with the Fifth Amendment's guarantee of due process." *Id.* Whether sufficiently outrageous government conduct exists "turns upon the totality of the circumstances with no single factor controlling," but the defense may "only be invoked in the rarest and most outrageous circumstances." *United States v. Haimowitz,* 725 F.2d 1561, 1577 (11th Cir. 1984) (internal quotation marks omitted).

This Court has suggested that the government's conduct would be sufficiently outrageous if the government "instigate[d] the criminal activity, provide[d] the entire means for its execution, and [ran] the entire operation with only meager assistance from the defendant." *United States v. Puett*, 735 F.2d 1331, 1335 (11th Cir. 1984). But, the government argues, that is not what happened here.

After considering the totality of the circumstances, we cannot say that the government's conduct was sufficiently outrageous in this case. There was no evidence that Williams had, prior to meeting the CHS, transported drugs, so we accept that the government instigated the criminal activity by having the CHS pose as a drug dealer who needed assistance moving large quantities of drugs. But this is not a case where the government provided the entire means for the scheme's

10

operation or where the defendant provided only meager assistance. Williams transported drugs for the CHS while wearing her uniform with the express understanding that the uniform would help protect the drug deliveries from law enforcement interdiction. She furthered the criminal scheme when she put the CHS in contact with two other prison guards who joined the scheme, including personally approaching Minor to recruit her.

Williams argues that we should follow the Third Circuit's reasoning in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), to conclude that the government's conduct in executing the reverse sting operation was so outrageous as to violate due process. In *Twigg*, after pleading guilty to a crime, Robert Kubica agreed to aid the government in apprehending illegal drug traffickers. *Id.* at 375. Kubica approached defendant Henry Neville and proposed that they set up a laboratory to manufacture methamphetamine hydrochloride (speed). *Id.* Over several months, Kubica and Neville made arrangements to create a lab. *Id.* Neville then pulled into the operation William Twigg, who owed him a debt. *Id.* Neville "assumed primary responsibility for raising capital and arranging for distribution" of the speed, "while Kubica undertook the acquisition of the necessary equipment, raw materials, and a production site." *Id.* The government assisted Kubica with his end of the bargain, including by supplying Kubica with the hard-to-obtain chemical that was the key ingredient in manufacturing

11

speed. *Id.* During the process of setting up the lab and making the speed, "Kubica was completely in charge of the entire laboratory," and "[a]ny production assistance provided by Neville and Twigg was minor and at the specific direction of Kubica." *Id.* at 376. After the lab was established, operated for one week, and produced six pounds of speed, Neville and Twigg were arrested. *Id.*

The Third Circuit reversed Neville's and Twigg's convictions, concluding that the government's conduct in organizing this reverse sting operation was outrageous. *Id.* at 381-82. The Third Circuit reached this conclusion after considering several factors. First, the Third Circuit focused on the fact Neville and Twigg were not engaged in any ongoing criminal activity at the time that Kubica approached them, and they did not create the illicit plan. *Id.* at 381. Second, the Third Circuit considered that Kubica, the informant, controlled the operations and furnished all the expertise necessary to build the laboratory. *Id.* at 380-81. Third, the Third Circuit examined the "nature of the crime and the tools available to law enforcement agencies to combat it." *Id.* at 378 n.6. The court explained that the crime at issue, drug manufacturing, was not a fleeting and elusive crime. *Id.* at 378. The court acknowledged that crimes involving the *sale* of illegal drugs, because of their fleeting and elusive nature, could "require more extreme methods of investigation." *Id.*

12

Since deciding *Twigg*, the Third Circuit has narrowly applied *Twigg*'s reasoning and has never held since that the government engaged in outrageous conduct in executing a reverse sting operation. *See United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017); *United States v. Beverly*, 723 F.2d 11 (3d Cir. 1983). In *Beverly*, an informant introduced defendant Dorrie Adams to Darrell O'Connor (an undercover government agent), telling Adams that O'Connor could help him make money. 723 F.2d at 12. O'Connor offered Adams $3,000 to burn down a building owned by a friend. *Id.* Adams agreed to participate and recruited defendant Lawrence Beverly to help him. *Id.* Beverly told O'Connor that he had never committed arson before but was willing to go along. *Id.* O'Connor brought Adams and Beverly to a service station, bought gasoline, ascertained that Adams had matches, and drove them to a building owned by the government. *Id.* Adams and Beverly were arrested before burning down the building and convicted of conspiring and attempting to destroy a government building by fire. *Id.*

On appeal, Adams and Beverly, relying on *Twigg*, asserted that the government's conduct was outrageous and deprived them of due process. *Id.* The Third Circuit affirmed their convictions, questioning whether *Twigg* had been correctly decided and whether it remained good law in light of Supreme Court and subsequent Third Circuit precedent. *Id.* at 12-13. The court in *Beverly* explained that the outrageous conduct defense "should be accepted by a court only to curb

13

the most intolerable government conduct." *Id.* at 12 (internal quotation marks omitted).  Despite expressing "grave doubts about the propriety" of the government's tactics in using the reverse sting operation, the Third Circuit nonetheless concluded that law enforcement's conduct did not "shock[] the conscience." *Id.* at 13.

We decline to apply the reasoning of *Twigg* here.  It is true that, as in *Twigg*, the government created a reverse sting operation that targeted individuals, like Williams, who were not engaged in criminal behavior before being approached to join the drug transportation scheme.  But the important difference here, as we explained above, is that Williams gave more than minor assistance to the scheme when she transported drugs for the CHS, wore her uniform to avoid law enforcement detection, and put the CHS in contact with Minor and Fluellen.  As the Third Circuit acknowledged in *Twigg*, "fleeting and elusive crime[s]," like drug dealing, may "require more extreme methods of investigating" in a reverse sting operation.  *Twigg*, 588 F.2d at 378.  Although troubling, the government's conduct here does not shock the conscience, so we cannot say that it was outrageous enough to amount to a violation of due process.  We caution that our decision should not be read "as an approval of the government's conduct" in carrying out this type of reverse sting operation.  *Beverly*, 723 F.2d at 13.

**B.    The District Court Operated Under a Misunderstanding of the Law in Applying a Two-Level Enhancement for a Supervisory Role.**

Williams also raises a separate challenge to her sentence, arguing that the district court improperly calculated her offense level under the Sentencing Guidelines when it applied a two-level supervisory role enhancement pursuant to U.S.S.G. § 3B1.1(c). Because the district court appears to have erroneously believed that it was compelled by precedent to apply the enhancement, we vacate Williams's sentence. We remand for resentencing so that the district court may apply the correct legal standard in considering whether to apply the enhancement.

Section 3B1.1 provides for a two-level enhancement in a defendant's offense level if she "was an organizer, leader, manager, or supervisor" of criminal activity. U.S.S.G. § 3B1.1(c). For the enhancement to apply, the defendant must exert "some degree of control, influence, or leadership" in the criminal conspiracy. *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006) (internal quotation marks omitted). The commentary to the Guidelines directs a court, in assessing a defendant's role, to consider the following factors: (1) whether she exercised decision making authority, (2) the nature of her participation in the commission of the offense, (3) whether she recruited accomplices, (4) whether she claimed a right to a larger share of the fruits of the crime, (5) her degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority she exercised over others. U.S.S.G.

15

§ 3B1.1 cmt. n.4.  This multi-factor analysis requires a district court to decide whether, under the totality of the circumstances, the enhancement should apply. *See United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005) (indicating that a district court should weigh the "various factual considerations" set forth in the commentary to the Guidelines to determine whether the enhancement applies on a "case-by-case" basis).  There is no requirement that all the considerations have to be present for the enhancement to apply.  *Id.*

Because Williams objected to the PSI's application of the supervisory role enhancement, the government bore the burden of proving "by a preponderance of the evidence the facts necessary to support" the enhancement.  *United States v. Little*, 864 F.3d 1283, 1290 (11th Cir. 2017) (internal quotation marks omitted); *accord Martinez*, 584 F.3d at 1027.  The government introduced evidence showing that Williams personally asked Minor to join the criminal scheme and also provided Minor's and Fluellen's names and phone numbers to the CHS.  The government's evidence also showed that Williams received a larger payment for the drug transactions that she completed with Minor and Fluellen.  There was no evidence, however, that Williams exercised any decision making authority in the criminal scheme, was involved in the planning or organizing of the offense, or had any control or authority over others involved in the scheme.

16

At the sentencing hearing, the district court concluded that it was bound by precedent to apply the supervisory role enhancement.  The court expressed concern about the enhancement, stating that the court was "not completely convinced that it is fair" to apply it.  Doc. 819 at 17.  The court then explained that it was bound to apply the enhancement:  "Let me put it like this:  I feel that if I were to find that she was not subject to a role enhancement, I would be reversed."  *Id.*  These statements indicate that the court was concerned about whether application of the supervisory role enhancement to Williams was appropriate, but believed precedent required it to apply the enhancement because Williams had recruited an accomplice or accomplices to join the scheme.  The district court's conclusion was based upon a misunderstanding of the law.

The government argues that the district court properly applied the supervisory role enhancement because this Court previously has affirmed the application of the enhancement when the only evidence of the defendant's supervisory role was recruitment of co-conspirators.  But the government's argument fails to address the question at the heart of the district court's reasoning: whether our precedent *compels* a district court to apply the enhancement when the defendant recruited others to join the scheme.

There is another potential flaw in the government's argument:  it is less than clear whether our precedent actually permits a district court to apply the

enhancement based solely on evidence that the defendant recruited others to join the criminal scheme.  In most of the published cases cited by the government, we affirmed the application of the enhancement when the defendant had recruited co-conspirators *and* taken other actions indicating control, influence, or leadership over the organization.  *See, e.g.*, *Ndiaye*, 434 F.3d at 1304; *United States v. Njau*, 386 F.3d 1039, 1041 (11th Cir. 2004); *United States v. Perry*, 340 F.3d 1216, 1217-18 (11th Cir. 2003).

The government cites only one published case that even arguably supports its position that the enhancement may be applied based solely on evidence that the defendant recruited accomplices.  *See United States v. Thomas*, 446 F.3d 1348, 1355 n.2 (11th Cir. 2006).  And it is unclear whether *Thomas* actually addressed this issue.  True, we stated in a footnote in *Thomas* that the district court did not err in applying the enhancement because the defendant had recruited others to join the scheme.  *Id.*  But we also explained, in a separate section of the opinion, that the defendant was as an "organizer or leader" of the conspiracy because he determined the manner by which the crime would be committed and the level of violence necessary and obtained firearms for use in the crime, in addition to recruiting other participants.  *Id.* at 1357.

We need not decide whether our precedent permits a district court to impose the supervisory role enhancement based solely on the fact that the defendant

18

recruited others to join the scheme.  This appeal presents a different question: whether the district court erred when it concluded that our precedent *required* it to impose the enhancement.

The district court, in effect, adopted a bright line rule that the enhancement must be applied whenever the defendant recruited an accomplice.  But the district court did not identify and the parties did not cite any case supporting such a rule. The district court's application of this bright line rule cannot be reconciled with our instructions that a district court should determine whether the enhancement applies on a "case-by-case" basis in light of "various factual considerations" including: whether the defendant exercised decision making authority, the nature of her participation in the offense, whether she claimed a larger share of the fruits of the crime, her degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree or control or authority that she exercised over others.  *Ramirez*, 426 F.3d at 1356 (citing U.S.S.G. § 3B1.1 cmt. n.4).

After the district court expressed doubt about whether a supervisory role enhancement should be imposed on Williams, the court's erroneous understanding of the law led it to conclude that it was required to apply the enhancement without considering other factors.  We thus vacate Williams's sentence and remand for resentencing so that the district court can determine whether, in light of the proper

legal standard, Williams served as "an organizer, leader, manager, or supervisor" of the criminal activity and thus should be subject to a two-level role enhancement. U.S.S.G. § 3B1.1(c).

## IV.    CONCLUSION

For the reasons set forth above, we affirm Williams's conviction, vacate her sentence, and remand the case to the district court for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**