[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 18, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12424
Non-Argument Calendar

_____

D. C. Docket No. 04-00126-CR-ORL-19-DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THOMAS EDWARD SPRINGER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 18, 2006)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

PER CURIAM:

Thomas Edward Springer appeals his conviction for being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). On appeal, he argues that (1) the district court violated his Sixth Amendment Confrontation Clause rights in light of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), by allowing an expert opinion based, in part, on hearsay, or, in the alternative, violated the pre-Crawford Federal Rule of Evidence 703; and (2) abused its discretion by denying his motion for a mistrial. For the reasons set forth more fully below, we affirm.

Springer was charged in a superseding indictment with one count of being a convicted felon in possession of a firearm, and one count of possessing an unregistered shotgun with a barrel shorter than 18 inches, violations of 18 U.S.C. §§ 922(g), 924(a)(2) and 26 U.S.C. §§ 5861(d) and 5871, respectively.[1] The indictment charged Springer with possession of seven firearms affecting interstate commerce, three of which, in relevant part, were (1) a Harrington & Richardson Shotgun; (2) a Remington Arms rifle; and (3) a Marlin Glenfield rifle. A jury returned a verdict of not guilty as to the unregistered firearm count , but was unable to render a verdict as to the felon-in-possession count.

The government retried Springer on the felon-in-possession count, and a

_____

[1] The parties stipulated to the jury that Springer was a convicted felon.

2

jury returned a verdict of guilty, specifically finding that the government had proven beyond a reasonable doubt that Springer, as a convicted felon, had illegally possessed the firearms at issue. He was later sentenced to 51 months' imprisonment.

Prior to the first trial, and renewed before the second trial, Springer was granted a motion in limine prohibiting any witness from referencing the suspected battery of Diane Springer on March 16, 2004, which led to Springer's arrest and the discovery of the firearms forming the basis for the present charge. Before the second trial, the court was made aware that the parties had agreed that the government's witnesses would not raise the domestic violence incident, or any of the photographs from that incident that prompted the police to respond.

Later, during the cross-examination of Deputy Michael Nelson, who arrived on the scene at Springer's home in response to a 911 call on March 16, counsel for Springer asked Nelson several questions regarding the discovery of weapons in Springer's home and, specifically, regarding what Mrs. Springer might have said to Nelson regarding loaded weapons in the house before Nelson performed a protective sweep. The following exchange ensued:

> Q.      Is it correct that you didn't vocalize anything to
>          Mr. Wasser[2] regarding doing a protective sweep

---

[2] Wasser was another deputy who responded to the 911 call with Nelson.

3

> . . . ?
>
> A.    Basically, we knew that Mrs. Springer was in the
>       back of house, she wasn't coming out of the back
>       of the house, at which point I then went towards
>       that section of the house to make contact with her.
>       And, like I said, working with [Wasser], we know
>       what, basically, each others' job is to do.
>
> Q.    And when you were back there, Ms. Springer
>       never told you that there were other guns in the
>       house which were loaded, did she?
>
> A.    No, she just stated that she was in fear of weapons
>       in the house, which at that time I assumed those
>       weapons that were in the room.

No objection was raised at this point, and then Nelson was questioned about safety procedures when there are loaded weapons in a home, and, at one point, responded to Springer's counsel by saying that Mrs. Springer was very upset and that he was "just trying to explain why" his conversation with Mrs. Springer did not go any further.

A few questions followed, and then Springer's counsel asked the following, to which the government objected on a hearsay ground that was overruled:

> Q.    Answer this only if you're aware or not.  Are you
>       aware of the fact that Mrs. Springer has testified
>       under oath that she told you that there were loaded
>       weapons in the house?
>       . . . .
>
> A.    Under oath? I did not hear her say that.  No, I don't

4

know.

Q.     Okay.  So then, it's your testimony you never
       heard her make that comment before?

A.     Basically, just the information she provided me on
       that date, which was limited information, that she
       was afraid that she was going to be killed by the
       weapons that were in the house, which I assumed -

Springer's counsel then objected to Nelson's answer as non-responsive and orally

moved for a mistrial, which the court overruled and denied, respectively.

Nelson was then asked when Ms. Springer had told him that Mr. Springer

(the defendant) was a convicted felon, leading to the following:

A.     I believe, it was while I was in the room with her
       while waiting for other county personnel.

Q.     And she just said, "He's a convicted felon."

A.     She was stating that she was in fear that he was
       going to use the weapons on her.  She had made
       mention that - -

Mr. Horween: Judge, I'm going to object to nonresponsive - -

Court: Counsel, the witness has to answer your question
with what he knows, and he is answering your question.
I'll overrule your objection.

Mr. Horween: And I'll, again, request a mistrial for the record.

Court: A mistrial is denied.  Please proceed.

Later, Springer renewed his motion for a mistrial.  Referencing the question

5

to Nelson of whether he knew that Mrs. Springer had testified that she told Nelson about loaded guns in the house, Springer argued that Nelson's response was non-responsive and suggested to the jury that Springer had been arrested on unrelated charges. He further argued that Nelson's statement contained a reference to Mrs. Springer believing that she would be killed, suggested a threat to Mrs. Springer, suggested that Mr. Springer (the defendant) had knowledge of the weapons, and, furthermore, violated the motion in limine. The district court denied the motion, stating that:

> [Nelson] did not answer whether that was under oath, but the man was struggling to answer your questions, and I am sure struggling to stay within what is, I assume, the direction to him . . . about not to get into what had occurred in that house and why Mr. Springer was arrested on that date. It does not warrant a mistrial.

Springer continued to argue for a mistrial, next pointing to Nelson's testimony regarding when Mrs. Springer had told him that Mr. Springer was a convicted felon. Specifically, Springer argued that Nelson's statement, that Mrs. Springer was afraid that the weapons would be used on her, was unresponsive to the question asked, especially in light of the fact that Nelson had testified in court before and was aware of the parameters of the motion in limine. Springer further argued that, because of Nelson's statement, the jury twice heard that Mrs. Springer was in fear of Mr. Springer using the weapons on her, suggesting that "perhaps he

6

was arrested regarding the use of weapons on her," which was prejudicial and a violation of the motion in limine. The motion was denied.

In the alternative, Springer requested that the jury be given a curative to disregard any testimony regarding any alleged criminal act or accusation regarding Mr. Springer toward Mrs. Springer on March 16, 2004. The government objected to the instruction as unnecessary, given that Springer's counsel's question elicited Nelson's response. Springer responded that his question called for a yes or no answer, not the response Nelson actually gave. The court then stated, "this witness . . . was struggling. I could see him struggling because he . . . had been told not to talk about these things. And it sounded . . . that you were asking him these questions about [whether the] guns were loaded." Ultimately, the following jury instruction was added at Springer's request, despite admonishment from the government and the court that it might draw unnecessary attention to Nelson's testimony:

> The defendant is on trial only for the specific offense that is alleged in the first superseding indictment, and that will be attached to the verdict form. He is not on trial for any other offense.

Also at issue in this case is the expert testimony used to prove that the firearms forming the basis for Springer's conviction moved in interstate commerce

and were not antiques.[3] That testimony was delivered by Bureau of Alcohol,

Tobacco, Firearms, and Explosives (ATF), agent Alina Sacerio-Polak, a 20-year

veteran. After testifying to her training and experience with firearms, Polak was

accepted over objection as an expert witness in the area of "firearms and interstate

nexus." Springer does not challenge her qualifications as an expert on appeal.

During her direct examination, Polak testified, in relevant part, that the H&R

shotgun was found to have been made in Massachusetts. The Remington rifle was

found to have been manufactured in 1902 in New York. Polak also identified the

Marlin Glenfield rifle as having been manufactured in Connecticut. All three of

these firearms were determined to be qualifying firearms, as opposed to antiques,

under the Gun Control Act because they were manufactured after 1899.

On cross-examination, Polak explained that her findings were based on

several sources of reference, including her training, books, and contacts with the

gun manufacturers, who are required, under industry regulations, to provide the

ATF information. As to the specific guns attributed to Springer by the jury, Polak

testified that, with regard to the H&R shotgun, she collected information about the

---

[3] The record reflects that a total of ten weapons were seized from Springer's residence, but of those ten, three weapons were considered "antiques" under the Gun Control Act of 1968, 18 U.S.C. § 921(a)(16), because they were manufactured in or before 1898, and thus, these weapons were not charged in the indictment. Upon review of his brief, Springer contests only the interstate nexus, and not whether the weapons were antiques.

8

gun and sent that information to the National Tracing Center in West Virginia, which then traced the gun to the licensed distributor. She further testified that the gun was manufactured in 1982. However, when asked how she knew, she first stated that it was contained in ATF records, and later admitted that the tracing center called the manufacturer to obtain the information. Polak could not remember with whom she had spoken, could not produce a document at that time to back her finding, and did not have the records with her in court. Finally, Polak indicated that the serial number on the weapon told her that the gun was manufactured in 1982.

Turning to the second gun, the Remington rifle, Polak testified that the model of the gun, not the identification or serial number, told her when the gun was manufactured. Polak identified the gun as a model number 4 rifle based on a document that was faxed to her by Remington. She could not remember whether that document had been provided to the defense, but the document led her to conclude that the firearm had been manufactured in 1902. She later clarified that the gun was made sometime between 1902 and 1933, but she could not be exactly certain of the year. Counsel for Springer then obtained the document in question from Polak, which was identified as a Remington record. Polak testified that the record in question formed the basis of her expert opinion, and that the document

9

had been received from Tom Holden, Remington's historian, with whom she had spoken.

At that point, counsel for Springer objected, stating that Polak's "expert opinion," could not be based solely on hearsay, and he asked that the court strike her expert opinion. The district court overruled the objection, finding that counsel's statement of the law was incorrect. As for the third firearm, the Marlin Glenfield rifle, Polak was not able to trace the gun, but testified that it was manufactured in Connecticut at the Marlin factory between 1960 and 1965. Polak based her opinion on her own research and spoke to no one regarding the manufacture date. Among her reference materials, which she kept in her office, were books, ATF records and materials, and a compact disc with manufacturers' information maintained by the ATF, distributed during interstate nexus training classes. Furthermore, she testified that she previously had visited the Marlin factory and observed how guns were manufactured and marked while there.

On redirect, Polak explained that she uses over a dozen books, publications, 3 CDs, and internally-relayed industry-related information during her research process. She also testified that she had visited the manufacturers of each of the guns at issue in this case, and that each gun had been stamped with the city, state, and manufacturer name. Furthermore, upon examining the stamps, she determined

that none of the firearms had been re-stamped at any time.  The jury returned a verdict of guilty, and the district court ultimately sentenced Springer to 51 months' imprisonment.

## I.  Confrontation Clause and Crawford

On appeal, Springer first argues that the district court erred by allowing Agent Polak to establish an interstate nexus for the firearms forming the basis for Springer's conviction because her opinion relied upon testimonial hearsay in violation of the Confrontation Clause in light of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  He argues that prior to Crawford, an expert could rely, in part, on hearsay when forming an opinion, but post-Crawford, and in particular in light of this Court's unpublished opinion in United States v. Buonsignore, 131 Fed. Appx. 252 (11th Cir. 2005), an expert may not rely on testimonial hearsay unless the defendant had a prior opportunity for cross-examination of the declarant.  Springer further argues that, while Crawford appears to permit the use of "business records," the government in this case did not lay the foundation to prove that the records relied upon in this case were business records rather than records compiled for litigation purposes.  Springer argues that Polak's expert opinion relied exclusively on testimonial evidence that was not "unavailable" for trial or cross-examined by him, and, therefore, the expert's

11

opinion was inadmissible and his conviction should be reversed.

At the outset, the parties disagree as to the proper standard of review. The government's position is that Springer objected at trial solely on grounds that an expert's opinion could not be based solely on hearsay, and, therefore, the Confrontation Clause challenge being raised on appeal was not preserved and should be reviewed for plain error. In reply, Springer argues that raising a hearsay objection, if sufficient in a habeas petition to place a state court on notice of a subsequently raised Confrontation Clause claim, should be sufficient to have raised the claim in the instant case, citing Hutchins v. Wainwright, 715 F.2d 512, 518-19 (11th Cir. 1983) (holding, in a state habeas context, that a petitioner's repeated objections to the use of out-of-court statements of an unidentified informant, while obliquely stated, was sufficient to alert a state court of a Confrontation Clause claim).

Recently, we held that, where the defendant at sentencing objected on hearsay grounds, but did not mention the Confrontation Clause or Crawford, it was insufficient to preserve the objection, and review would be for plain error only. United States v. Chau, 426 F.3d 1318, 1321-22 (11th Cir. 2005). Accordingly, we conclude that Springer's single hearsay objection at trial was insufficient to preserve the constitutional challenge under the Confrontation Clause, and we will

12

review for plain error only.

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied 125 S.Ct. 2935 (2005) (quotation and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. Furthermore, in order for an error to be plain, it must be clear under current law. See United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000). "[W]here neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." Id.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As we recently discussed, the Supreme Court, in Crawford, "explained that the founding generation understood the right to confrontation in the light of the common-law tradition of 'live testimony in court subject to adversarial testing.'" United States v. Cantellano, No. 05-11143, slip op. at 464 (11th Cir. Nov. 15, 2005). "The common-law tradition of confronting one's

13

accusers in court recognized that ex parte testimony raised issues of justice and fairness. Because testimony is accusatory and delivered in contemplation of criminal proceedings, it is adversarial. An accused, therefore, should have the opportunity to confront adverse witnesses face-to-face." Id. at 464-65, citing Crawford, 541 U.S. at 43-45, 124 S.Ct. at 1359-60.

In Cantellano, the issue was whether, under Crawford, the defendant had the right to cross-examine the government agent who witnessed the defendant leave the country and recorded the warrant of deportation that was admitted at trial over his objection. Id. at 465. After noting that the issue boiled down to whether the warrant of deportation was "testimonial" or "non-testimonial" evidence, we held that the defendant had no right to confront and cross-examine the agent because the routinely recorded warrant of deportation was "non-testimonial," and, therefore, not subject to the confrontation clause. Id.

As we have noted, the Supreme Court in Crawford left "for another day any effort to spell out a comprehensive definition of 'testimonial.' [footnote omitted]. Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68, 124 S.Ct. at 1374; Cantellano, slip op. at 465. However, "[b]ecause non-testimonial evidence is not prepared in the

14

shadow of criminal proceedings, it lacks the accusatory character of testimony."

Cantellano, slip op. at 465. Therefore, we concluded in Cantellano that "[b]ecause

a warrant of deportation does not raise the concerns regarding testimonial evidence

stated in Crawford, we conclude that a warrant of deportation is non-testimonial

and therefore is not subject to confrontation." Id.

When it comes to expert testimony, we held, prior to Crawford, that

"hearsay testimony by experts is permitted if it is based upon the type of evidence

reasonably relied upon by experts in the particular field." United States v. Floyd,

281 F.3d 1346, 1349 (11th Cir. 2002), citing Fed.R.Evid. 703.[4] In Floyd, a

government expert in establishing the interstate nexus requirement for convictions

under 18 U.S.C. § 922(g) testified that, after examining ammunition seized from

the defendant and consulting a Winchester catalog, he determined that the

ammunition had traveled in interstate commerce. Floyd, 281 F.3d at 1347. The

expert also testified that, to verify the information he obtained, he contacted a

technical advisor at the Association of Firearms and Tool Mark Examiners, and

stated that his determination that the ammunition moved in interstate commerce

---

[4] Providing, in relevant part: "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed.R.Evid. 703. As the Committee notes make clear, Rule 703 "governs only the disclosure to the jury of information that is reasonably relied on by an expert, when that information is not admissible for substantive purposes. It is not intended to affect the admissibility of an expert's testimony." Fed.R.Evid. 703, Adv. Comm. Notes, 2000 Amendments.

15

was based, in part, on what he was told by the technical advisor. Id. The expert told the court that it was his opinion that the ammunition moved in interstate commerce, and the information gleaned from the technical advisor was the kind reasonably relied upon by experts in the field. Id.

We affirmed, and held that, because the information was reasonably relied upon by experts in the field and the expert had testified that his opinion was not based exclusively on his conversation with the technical advisor, the testimony was properly admitted. Id. at 1349. While Floyd did not explicitly address the Confrontation Clause issue, Springer nonetheless argues that Floyd's holding regarding the use of hearsay testimony by an expert is no longer precedent.

Springer cites to an unpublished opinion in support of his argument, United States v. Buonsignore, 131 Fed.Appx. 252 (11th Cir. 2005) petition for cert. filed (U.S. July 29, 2005) (No. 05-5603).[5] Notwithstanding that Buonsignore is non-binding and, therefore, cannot be used to prove that any error was plain, the instant case is unlike Buonsignore. The expert in Buonsignore was not offering his own expert opinion– he was offering the expert opinion of an unidentified individual in Washington D.C., which means that the wrong expert was on the stand. Id. at 257. Here, as to at least two of the firearms, the H&R shotgun and the Marlin Glenfield

---

[5] Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority.

rifle, Agent Polak formed her own opinion based on her education, training, knowledge, and personal experience in consultation with books and records, as well as a consultation with an individual in the National Tracing Center. Even if Polak's opinion as to the Remington rifle were based solely on the testimonial evidence of a Remington historian and that evidence were excluded, the books, CDs and personal knowledge of Polak do not appear to be testimonial evidence subject to the Crawford rule.

In addition, Springer appears to challenge the "interstate commerce nexus," however, he neglects to mention that each of the firearms forming the basis for his conviction were stamped with the city and state in which they were manufactured. Since each of the firearms was stamped with a state other than Florida, and Polak's expert opinion was that the guns were not restamped, when the guns were discovered and found by a jury to be in Springer's possession in Florida, sufficient admissible evidence supported his conviction.

Again, to the extent that the evidence relied upon by Polak was testimonial in nature, Springer's argument may find some support in Crawford, and even in Cantellano. Neither case, however, involved expert testimony, and, more importantly, neither case addressed Crawford's holding in the context of expert testimony and an expert's ability to rely on otherwise inadmissible evidence when

17

forming an opinion under Rule 703. As best as can be discerned, neither this Court, the Supreme Court, nor any other circuit court has issued a published opinion regarding what otherwise inadmissible sources, testimonial or non-testimonial, an expert may rely upon when forming an opinion in light of Crawford. Thus, we conclude that any error the district court may have committed by permitting Polak's testimony was not plain.

## II. Federal Rule of Evidence 703

Alternatively, Springer argues that Polak's testimony was inadmissible even under the pre-Crawford evidentiary rules and Rule 703. He argues that the government failed to show that firearms experts customarily rely on the sources Polak relied upon, or that her sources had any particularized guarantee of trustworthiness.

Because Springer failed to object on the basis of Rule 703 at trial, we will review for plain error only. Chau, 426 F.3d at 1321-22. Federal Rule of Evidence 703 provides, in relevant part, that when an expert relies on otherwise inadmissible evidence, his opinion is still admissible so long as the inadmissible facts or data is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. As discussed above, we held in Floyd that "hearsay testimony by experts is permitted if it is based upon

18

the type of evidence reasonably relied upon by experts in the particular field."

Floyd, 281 F.3d at 1349.

Thus it appears that no error that is plain was committed. Even assuming that there was error and it was plain, we conclude that Springer's substantial rights were not violated. Polak personally examined the markings on the firearms, which indicated the state of manufacturing, and Polak knew, from her training and experience and personal visitation, where the manufacturers were located. She further testified that guns had not been restamped. Based on the markings and her knowledge and training, she was able to give her opinion that the firearms moved in interstate commerce. Notwithstanding any potential hearsay problem, she had visited at least two of the manufacturers of the firearms supporting Springer's conviction. Her testimony in that regard was based on her own training, education, and personal experience, and, therefore, not hearsay. Accordingly, because Polak's testimony established the interstate nexus required for the jury to convict Springer, his substantial rights were not violated by any possible error.

### III. Motion for Mistrial

Lastly, Springer argues that the district court abused its discretion by not granting a mistrial after Deputy Nelson gave testimony that he argues violated the parties' agreement not to make references to domestic violence. Specifically, he

19

argues that Nelson's testimony was hearsay and more prejudicial than probative. Furthermore, he argues that the government had agreed not to introduce the evidence/testimony at issue, and that the violation of that agreement prejudiced him to the point that a mistrial should have been declared. Finally, Springer argues that the curative instruction did not cure the harm.

We review the denial of a motion for a mistrial for abuse of discretion. United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005). We have stated that "[t]he abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." United States v. Kelly, 888 F.2d 732, 745 (11th Cir.1989).

We have held that the decision whether or not to grant a mistrial "lies within the sound discretion of a trial judge as he or she is in the best position to evaluate the prejudicial effect of improper testimony." United States v. Perez, 30 F.3d 1407, 1410 (11th Cir. 1994); accord United States v. Saget, 991 F.2d 702, 707-08 (11th Cir. 1993) ("the trial judge . . . is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury."). Furthermore, "[w]hen a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." Id.

Having reviewed the record, we conclude that it cannot be said that the district court made a clear error in judgment by denying Springer's motions for a mistrial. It was in the best position to decide the prejudicial effect of any improper testimony, and given the context of the cross-examination, the nature of the questions asked, the district court's findings regarding the testimony in question, and the curative instruction given, we conclude that it did not abuse its discretion by denying Springer's motions.

Furthermore, to the extent Springer argues that the government breached its agreement under the motion in limine to exclude references to the domestic violence incident that caused police to respond on March 16, this contention is without merit. First, Springer has neither alleged nor proven that the government told Nelson to interject the testimony at issue in this case. More importantly, it was Springer's counsel, not the government, who elicited the testimony in question by asking one question too many. Finally, Nelson's testimony did not reference domestic violence and, therefore, did not violate the parameters of the motion in limine.

Based on the foregoing, we conclude that the district court committed no reversible error. We, therefore, affirm Springer's conviction.

**AFFIRMED.**

21