[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 12-15348
Non-Argument Calendar

D.C. Docket No. 1:11-cr-20324-MGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MYRON BUDNICK,

Defendant-Appellant.

Appeal from the United States District Court for
the Southern District of Florida

(January 10, 2014)

Before HULL, WILSON and FAY, Circuit Judges.

PER CURIAM:

A jury convicted Myron Budnick for acts related to his role in a conspiracy designed to operate sham companies to elicit credit and receive goods from vendors knowing that he and his co-conspirators would abandon the sham

companies before those companies paid for the delivered goods.  This scheme is referred to as a "bust-out."

Budnick appeals his convictions and sentences for one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and four counts of substantive wire fraud, in violation of 18 U.S.C. §§ 2 and 1343.  On appeal, Budnick argues that the district court erred by:  (1) declining to remove an impaneled juror; (2) declining to give a requested jury instruction; and (3) increasing Budnick's sentencing offense level based on his leadership role in the criminal offense.

After review of the entire record on appeal and upon consideration of the parties' briefs, we affirm.

## I.  DISCUSSION

### A.    Retaining an Impaneled Juror

Budnick argues that the district court abused its discretion by declining to remove an impaneled juror who had a strong reaction to certain testimony.

Budnick and his co-conspirators defrauded companies of goods under the false pretense that their sham companies would pay for such goods.  One victim of the conspirators' scheme was Mil-Spec Packaging of Georgia ("Mil-Spec"), a vendor that manufactured and distributed packaging materials that were certified to

2

government specifications.  Mil-Spec sold its goods to the federal government, government contractors, and private commercial companies.

During a lunch recess, one juror, a military veteran, told a courtroom deputy that he had concerns about the acts committed against Mil-Spec.  Before resuming trial, the district court questioned the juror in the presence of Budnick, his counsel, and the prosecutor.  At the court's request, the juror described his concern.  As a military veteran, the juror expressed concern that fraud, such as the fraud against Mil-Spec, either (1) raises the price of the goods sold to the military or (2) reduces the quality of goods sold to the military.

After conferring with defense counsel and the prosecutor, the district court had this colloquy with the juror:

> THE COURT:  Sir, you reported to us that you had a very strong reaction when you heard [the] testimony [concerning the fraud perpetrated on Mil-Spec].
>
> A JUROR:  Yes, I did.
>
> THE COURT:  Now, you understand that in this case, neither side has disputed that a fraud occurred based upon what you've heard?  Do you understand that?
>
> A JUROR:  Yes, ma'am.
>
> THE COURT:  And the only question is whether or not Mr. Budnick participated in the fraud.  Do you understand that?
>
> A JUROR:  Yes, ma'am.

3

THE COURT:  Based upon your feelings do you believe that you would be able to his [sic] listen to all the evidence and render a decision based only on the evidence in this case and not on any of the feelings that you have just discussed with us in open court?

A JUROR:  Is the evidence that were [sic] presented before for Mil-Spec not considered part of the trial?

THE COURT:  Oh, it's part of this trial, but you still have to determine whether or not this defendant was the individual who committed the fraud.  You still have to make that determination as a juror.

A JUROR:  Okay.  I can keep an open mind to the rest of the evidence that is going to be shown to us, but it is going to be in the back of my mind, the whole Mil-Spec situation.

The district court told the juror that it would hold the juror to his word that he "will make every effort to be impartial in this case and listen to the evidence."

The district court instructed the juror that he must "not have any discussion with the other members of the jury about what we have discussed here in open court."  The district court also instructed, "If for some reason you feel the need to have this discussion again, please bring it to [the courtroom deputy's] attention."

4

Here, we cannot say that the district court abused its considerable discretion by declining to remove the impaneled juror.[1]  After conducting a thorough inquiry into the juror's concern and potential bias, the district court determined that the juror would be able to listen to the evidence and render a decision as to whether Budnick individually participated in the fraud based on that evidence.  In fact, with respect to whether Budnick participated in the fraud, the juror told the court that he would keep an "open mind to the rest of the evidence."  The district court also did not abuse its discretion in relying on this statement from the juror.

Moreover, the district court instructed the juror to bring any further related concerns to the courtroom deputy's attention.  The juror never expressed additional concerns or thoughts of bias.

Having found no impairment to the juror's impartiality, the district court acted within its sound discretion in denying Budnick's request to remove the impaneled juror.

---

[1]We review a district court's decision to remove a juror for an abuse of discretion. United States v. Augustin, 661 F.3d 1105, 1129 (11th Cir. 2011).  Just cause exists to discharge a juror if, inter alia, the court finds evidence that the juror cannot decide the issues fairly.  United States v. Register, 182 F.3d 820, 840 (11th Cir. 1999).  The district court's discretion will not be disturbed absent a showing of bias or prejudice to the defendant.  United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986).

**B.    Jury Charge**

Budnick argues that the district court abused its discretion by declining to give a requested jury instruction.

The indictment alleges that Budnick and four others (1) conspired to commit wire fraud and (2) committed wire fraud.  The indictment alleges that the conspiracy occurred "[f]rom on or about May 19, 2008, through on or about August 28, 2010."  Specifically, the indictment alleges that Budnick and his co-conspirators performed bust-outs on four sham companies.  The indictment also alleges four substantive counts of wire fraud that occurred between September 2008 and November 2009.

In mid-July 2010, one of Budnick's co-conspirators, Ernesto Robau, met with the government agent investigating the conspiracy.  Ultimately, Robau agreed to cooperate with the government investigation.

Specifically, in August 2010, Robau cooperated with the government, and, with Robau's knowledge and assistance, the government recorded a particularly adverse conversation between Budnick and Robau at the "Ale House."  At trial, Robau testified about the entire criminal scheme, including the acts discussed in his "Ale House" conversation with Budnick.  During Robau's testimony, the government published the "Ale House" recording and a subsequent telephone

6

conversation between Robau and Budnick. The government also submitted into evidence several emails between Robau and Budnick.

After Robau became an informant, Budnick could not be a co-conspirator with Robau. See United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986) ("[A] person cannot conspire with a government informer who secretly intends to frustrate the conspiracy."). As a result, Budnick requested the following jury instruction:

> Members of the jury, you are hereby instructed that after July 28, 201[0], and prior to the meeting at the Ale House, Ernesto Robau became the Government's agent and informer and thereafter could not be a co-conspirator with Myron Budnick because one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator.

The district court did not abuse its discretion by declining to give this jury instruction.[2] The indictment alleged four substantive counts of wire fraud that occurred between September 2008 and November 2009—all well before the time

---

[2]We review a district court's refusal to give a requested jury instruction for an abuse of discretion. United States v. Palma, 511 F.3d 1311, 1314-15 (11th Cir. 2008). "We will find reversible error only if (1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." Id. at 1315 (internal quotation marks omitted). A "defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." Lively, 803 F.2d at 1126 (internal quotation marks omitted).

7

that Robau first worked with the government to record the August 2010 Ale House conversation. The jurors had a copy of the indictment during their deliberations. Furthermore, the evidence at trial showed that Budnick and his co-conspirators completed the bust-out of the four sham companies described in the indictment before Robau acted as a government informant in August 2010. Specifically, the sham companies were opened in 2008 and 2009. And, the conspirators busted-out and abandoned the sham companies by January 2010. Thus, given the record as a whole, we cannot say that the district court abused its discretion by declining to give the requested instruction because Robau became a government informant months after the bust-out of the sham companies listed in the indictment ended.

Budnick's reliance on this Court's decision in United States v. Lively, 803 F.2d 1124, is misplaced. In Lively—under facts markedly different from the facts here—we held that it was reversible error not to give a jury instruction similar to the one Budnick requested.

In Lively, the indictment charged that the conspiracy occurred from March 1985 until May 1985. 803 F.2d at 1126. The co-conspirator in Lively became a government informant in March 1985, which was early in the alleged conspiracy period. Id. at 1126. Part of the Lively defendant's defense was that he was unaware of the illegal aim of the conspiracy until April 1985, which was after

8

his fellow co-conspirator became a government informant.  Id. at 1127-28.  Given the nature of the defense's theory, the Lively court held that the district court committed reversible error in failing to address a "vital aspect of the defense's theory of the case . . . that was not substantially covered by other instructions."  Id. at 1128.

Budnick made no such similar claim here—that is, Budnick did not argue at trial that he became aware of the criminal scheme only after Robau became a government informant.  And, Budnick failed to direct this Court or the district court to any evidence supporting that type of defense theory.  Thus, unlike the instruction in Lively, the requested jury instruction was not "vital" to Budnick's defense.  Consequently, the district court's failure to give the requested instruction did not substantially impair Budnick's ability to prepare or present an effective defense.

For these reasons, the district court acted within its sound discretion in denying Budnick's requested jury instruction.

## C.    Sentencing Guidelines

Budnick argues that the district court erred by increasing his offense level four levels for Budnick's leadership role in the criminal offense.

9

A defendant's offense level is increased four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). To qualify for the increase, the defendant must have acted as an organizer or leader "of one or more other participants." Id. § 3B1.1, cmt. n.2. However, to be considered an organizer or leader, a defendant need not have been the sole leader or kingpin of the conspiracy. United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005).

"In distinguishing a leadership and organizational role from one of mere management or supervision," the district court considers the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. 4. The government must prove the existence of a leadership role by a preponderance of the evidence. United States v. Alred, 144 F.3d 1405, 1421 (11th Cir. 1998).

10

The district court did not clearly err by increasing Budnick's offense level four levels pursuant to U.S.S.G. § 3B1.1(a).[3]  The trial evidence supported the district court's finding that Budnick exerted a leadership or organizational role over one or more participants.[4]  For example, the evidence showed that Budnick took on a leadership role in the conspiracy by:  (1) preparing annual reports and reinstatements for the sham companies; (2) deciding to use fraudulent credit or trade references for companies without existing references; (3) sending letters to creditors representing himself as the attorney of several fraudulent corporations; (4) reinstating inactive corporations and changing the owners, officers, and directors of those corporations; (5) recruiting an employee, Franklin Wellman, into the conspiracy; (6) taking merchandise obtained by the conspiracy without apparent payment; and (7) finding new companies on which to perform bust-outs. The evidence also shows that Budnick acted as an organizer or leader of another participant by recruiting an employee into the scheme and supervising the employee in establishing a sham company.

---

[3]We review for clear error a district court's factual finding that a defendant was an organizer or leader to support an increase in the offense level pursuant to § 3B1.1(a).  Ramirez, 426 F.3d at 1355.

[4]There is no dispute that the conspiracy involved at least five participants.

11

The district court expressly referenced some of this evidence before overruling Budnick's objection to the offense-level increase at the sentencing hearing. Specifically, in response to Budnick's argument that the leadership-based increase was unwarranted, the district court asked rhetorically:

> Who was the person who . . . sent the letters to the creditors when people started wanting their money back? Who was the individual who represented himself as the lawyer of some of these companies, when people tried to get their money back? Who was the person that got Mr. Wellman involved in this scheme?

In asking these questions, the district court made clear that it was well aware of the actions evincing Budnick's leadership role in the conspiracy. Moreover, the district court said, "I was present at trial. I heard the evidence. I believe that this enhancement is entirely appropriate, given the evidence that was produced at trial in this case."

Such comments show that the district court considered the evidence at trial and found that a preponderance of the evidence supported the offense-level increase for Budnick's leadership role in the offense. Thus, the district court did not clearly err in overruling Budnick's objection to increasing his offense level based on his leadership role in the offense.

## II. CONCLUSION

Budnick's convictions and sentences are **AFFIRMED**.

12