[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12994

_____

D.C. Docket No. 9:13-cr-80237-KLR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TREVOR ALEXANDER WATSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 27, 2015)

Before MARCUS and WILSON, Circuit Judges and THAPAR,* District Judge.

_____

*Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky,
sitting by designation.

THAPAR, District Judge:

Trevor Watson appeals his conviction and sentence for attempting to smuggle illegal immigrants into the United States. For the reasons below, we affirm his conviction but vacate the sentence and remand for resentencing.

**BACKGROUND**

Driving an overcrowded boat at night without lights is usually not a good idea. And on the night of November 23, 2013, Trevor Watson and his eight passengers discovered just that. That night, Watson was piloting a vessel approximately 19 miles[1] off the coast of Florida. His navigational lights were off. While scanning the seas aboard his Coast Guard cutter, Lieutenant William Belcher determined that both Watson's high rate of speed toward the coast (25 miles per hour) and his absence of lights were suspicious. So, he moved to intercept the vessel. But when the Coast Guard approached Watson's vessel, Watson stopped (now about 15 miles from the coast). At that point, Lieutenant Belcher sent a smaller boat to attempt to board the vessel. That boat turned on its blue lights, identified itself as the Coast Guard, and headed in the direction of the vessel. In response, Watson pulled away at a high rate of speed and "started

---

[1] According to testimony at trial, a vessel located more than 12 miles, but less than 24 miles, from the United States coast is in a "contiguous zone," which is considered international waters but is sufficient to constitute intent to enter. The United States border extends 12 miles out to sea.

2

maneuvering erratically." The smaller Coast Guard boat pursued, siren on, and ordered Watson to stop. After a five to ten minute chase, Watson finally stopped.

Three members of the Coast Guard then boarded the vessel hoping for a smooth removal of the passengers. They were not in luck. At this point, Watson learned his second boating lesson—don't overcrowd a boat or it might sink. Watson's boat was designed to hold six passengers, but Watson had nine onboard including himself. When the Coast Guard officers entered the boat, they ordered the passengers to stay put. But several passengers failed to heed that warning and tried to exit the boat. When they did, the vessel capsized and several other passengers fell into the ocean. The Coast Guard rescued all the passengers and safely brought them aboard the Coast Guard cutter.

Once everyone was aboard the cutter, the Coast Guard identified Watson and the passengers as non-U.S. citizens. Two of the passengers were repatriated to the Bahamas. Watson and the remaining passengers were brought to the Coast Guard Station in Florida, where officials determined that neither Watson nor his passengers were legally allowed to enter the United States.

The United States charged Watson with one count of conspiring to bring illegal immigrants into the United States, six counts of attempting to bring illegal immigrants into the United States for financial gain, and three counts of knowingly

3

aiding and assisting an illegal immigrant, who had previously been convicted of an aggravated felony, to enter the United States. Appendix of Appellant, D.E. 17.

*The mistrial.* The first trial on the charges resulted in a mistrial. The United States called, among other witnesses, Special Agent David Malone, who testified that Watson confessed to being paid to smuggle the illegal immigrants to the United States. Donovan Morgan, an illegal immigrant and passenger on Watson's vessel, also testified that he had paid another individual to reserve his spot on the vessel's voyage to the United States. Watson testified in his defense. He asserted that he had been paid only to show the passengers the lights from the buildings on the coast of Florida—what he termed a "nightcap." Watson maintained that he was not taking the individuals to the United States.

On the first day of jury deliberations, the jury asked to see a 42-minute video tape of Watson's voyage and interactions with the Coast Guard. In response, the court stated (outside the presence of the jury): "I would like to get them out of here sometime today, not bring them back tomorrow." However, when the jury came in to view the video tape, the court made clear that the jury could take as long as they needed to reach a verdict, and then allowed them to come back the next day.

The next day (Thursday), the court stated to counsel, "if they [the jury] don't have a verdict by five o'clock, we should declare a mistrial and start over again on Monday." The court went on to say that "this thing is going nowhere. There is

4

[sic] no real issues." The judge also noted his concern with having another judge take the verdict on Friday as he would be absent. Defense counsel objected, and the court modified its response. The court said it would be fine with the jury coming back on Friday if both parties agreed with another judge taking the verdict on Friday. The prosecution explained that he would be out on Friday. The court then said that they would "face" the issue "a little further down the line."

Later that day, the jury sent a note to the court saying "[w]e are deadlocked after over 12 hours of discussion." The court informed the parties that it would not give an *Allen* charge, but both the prosecution and defense counsel requested that the court provide the *Allen* charge. *See Allen v. United States*, 164 U.S. 492 (1896) (permitting jury instruction encouraging minority viewholders to reconsider). After counsel's request, the court gave the *Allen* charge to the jury.

Following further deliberations, the jury asked to have certain testimony read back to them, but the court reporter was unavailable. The judge offered to counsel to have the jury "deliberate tomorrow, and if they reach a verdict tomorrow, the verdict will be sealed, and then we will open it on Monday" in order to avoid having another judge take the verdict. *Id.* Further, the court said "[l]et's just hold this question [regarding the testimony]; and then at five o'clock, we will tell them to come back tomorrow." Later that same day, the jury sent another note saying they were deadlocked. In response to the note, the court told the parties that

5

it was "going to declare a mistrial" and instructed the courtroom deputy to bring the jury back in. Before the jury came into the courtroom, defense counsel objected, saying that the jury never received the requested testimony. The court overruled the objection and stated that the later note saying they were deadlocked superseded the request for testimony. Thereafter, the court discharged the jury.

*The 404(b) evidence.* The day after the mistrial, the United States filed a motion to introduce evidence implicating Federal Rule of Evidence 404(b). The United States explained that the evidence would show that Watson "was found adrift, approximately 50 miles off the coast of Jacksonville, Florida on or about August 21, 2013." The United States Coast Guard rescued Watson after his boat became disabled. Watson claimed he was fishing, but no fishing gear could be found. After Watson's rescue, he was removed from the United States because he did not have the proper documents to enter the United States. The prosecution sought to offer the evidence "as proof of motive, intent, plan, knowledge, and the absence of mistake."

The United States argued that this evidence would assist the jury "because it is unreasonable to believe that the defendant would engage in a pleasure cruise under these conditions after being recently rescued and deported." In a hearing before the district court, the prosecutor explained that "the evidence would be offered as both plan, knowledge, [and] intent, but really the strongest, absence of

6

mistake, if you will, this is a mistake on behalf of the Government and this was just a mere innocent act in November, but I find that to be hard to believe in relation to the fact that he was found in August off the coast in a vessel . . . ." The evidence would be introduced through the Coast Guard lieutenant who found Watson at sea and the officer who took Watson's statement and removed him.

The defense objected to the 404(b) evidence. Defense counsel explained that there was no defense of mistake or accident. The district court ruled for the United States, explaining, "I think it's admissible and I'll admit it. The story is so preposterous that the jury would believe this that people would pay $100 to get in a crowded boat and spend five or six hours across the ocean at night and see the lights . . . and go back, it's totally incredible." With that understanding, the district court admitted the evidence "to show a lack of mistake or a lack of accident," and the prosecution presented the evidence at trial.

*The new trial.* In addition to the 404(b) evidence, the United States beefed up its prosecution in the second trial in two important ways. First, the United States called two additional law enforcement agents—Special Agent Gary Saxton and Special Agent Frank Quinones—to corroborate Special Agent Malone's testimony of Watson's confession. Second, the United States declined to call several co-defendants who were on Watson's vessel, as defense counsel had some success impeaching those witnesses in the first trial. In all other respects, the trial

7

testimony in the second trial mimicked that from the first trial—including

Watson's testimony in his defense. After hearing the testimony, the jury

deliberated for a day, received an *Allen* charge, and returned a guilty verdict on

Counts 1 (conspiracy), 3 (attempted smuggling for financial gain), 8, 9, and 10 (all

three for smuggling an illegal immigrant convicted of an aggravated felony). The

jury acquitted Watson of the remaining counts.

Watson now appeals.

## DISCUSSION

In his appeal, Watson raises issues from his trial and sentencing, ranging

from evidentiary problems to constitutional pitfalls. None of the issues from trial

requires reversal. As to his sentencing, we remand for the district court to correct a

clerical error and address the general sentence.

## I.    Trial Challenges

### A.    Granting the Mistrial

Watson first argues that the district court erred in granting a mistrial.

According to Watson, the district court's statements to counsel reflected a desire to

end the trial prematurely based on scheduling concerns.

The doctrine of manifest necessity allows a district court "to declare a

mistrial and discharge a jury only where, 'taking all the circumstances into

consideration, there is a manifest necessity for the act, or the ends of public justice

8

would otherwise be defeated.'"  *United States v. Therve*, 764 F.3d 1293, 1298 (11th Cir. 2014) (quoting *United States v. Perez,* 22 U.S. (9 Wheat.) 579 (1824)). Our standard of review for the district court's grant of a mistrial depends on the reasons for the mistrial.  When the district court declares a mistrial due to the "unavailability of critical prosecution evidence," or because the prosecutor seeks "to achieve a tactical advantage over the accused," the appellate court must apply the "strictest scrutiny."  *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 508 (1978)).  If, however, the granting of a mistrial is "based on the trial court's belief that the jury is unable to reach a verdict—the 'classic basis for a proper mistrial'"—then the court's decision is ordinarily "accorded great deference."  *Id.* at 1299 (quoting *Washington*, 434 U.S. at 509–10).  Even where a trial court's mistrial decision receives "great deference," it "nonetheless must exercise 'sound discretion' in declaring a mistrial and cannot act 'irrationally or irresponsibly.'"  *Id.* (quoting *Washington*, 434 U.S. at 514–16).

Looking at the totality of the court's interactions with counsel and the jury, the court's scheduling concerns did not influence the mistrial decision.  In context, the court, while believing the jury was deadlocked (even after the first day), was ready and willing to accommodate the jury's deliberations and did so.  The court permitted the jury to come back the second day, gave an *Allen* charge, and agreed to a third day of deliberations, if necessary, before another judge.  In front of the

jury, the court did not express concerns with the length of deliberations but instead affirmatively told the jury that it could have as much time as it needed to deliberate. While the court made several statements to counsel that, out of context, may have suggested deliberations were taking too long, its actions and rulings gave the jury ample time and did not prioritize the court's scheduling issues.

The most problematic portion of the court's mistrial decision was not the ruling itself, but rather the procedure used in arriving at that determination. Federal Rule of Criminal Procedure 26.3 requires the court, "[b]efore ordering a mistrial, . . . [to] give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." Fed. R. Crim. P. 26.3. Here, the court granted the mistrial without offering the defendant or prosecution an opportunity to weigh in. Even though defense counsel objected when the court informed the parties of its decision, the court did not follow the dictates of the rule. "[T]he failure to comply with that mandate necessarily creates a strong suggestion that a trial judge did not exercise sound discretion." *United States v. Berroa*, 374 F.3d 1053, 1058 (11th Cir. 2004).

*Berroa* faced a similar situation as here, but we affirmed the mistrial even though the district court did not offer the parties an opportunity to respond to its decision. Like here, the *Berroa* district court declared a mistrial after (1) receiving

10

a note from the jury that it was deadlocked, (2) giving an *Allen* charge, and (3) receiving another note, after the *Allen* charge, that the jury remained deadlocked. *Id.* at 1059. Adding to the similarity, the *Berroa* district judge had also expressed scheduling concerns, but later altered his plans. *Id.* ("On balance, these events do not indicate that the trial judge declared a mistrial to accommodate his travel plans, but establish that the judge had changed his travel plans to accommodate the trial."). We held that "the circumstances reveal that the court's decision was not an abrupt, precipitous response to a single note from the jury, but was a deliberate decision made subsequent to three days of deliberations, a prior note declaring an inability to agree, and the jury's prior receipt of a modified *Allen* charge." *Id.* The same reasoning applies in this case. Though Watson's jury deliberated for only two days, as compared to three in *Berroa*, that fact is not dispositive. *Id.* at 1054. Relative to the length of the trial—a little over two days for Watson but eight days in *Berroa*—the jury in Watson's case deliberated longer than the jury did in *Berroa*. Further, while the judge in Watson's case did not ask for input from defense counsel, defense counsel did object before the judge brought the jury back to declare a mistrial. While that is by no means the preferred procedure, defense counsel was heard by the court. Accordingly, even though courts should proactively afford the parties an opportunity to be heard, the district court's

11

decision was not "abrupt" or "precipitous," but rather reasoned and deliberate.  As such, the mistrial was within the court's sound discretion.

### B.    The Admission of the 404(b) Evidence

Watson also appeals the district court's admission of his previous rescue by the Coast Guard.  We review the district court's admission of 404(b) evidence for abuse of discretion.  *See United States v. Perez*, 443 F.3d 772, 774 (11th Cir. 2006).  In assessing the district court's ruling, we apply a three-part test: "(1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that the factfinder could find that the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by undue prejudice."  *Id.* at 779.

On appeal, the United States pursues only two justifications for the admission of the 404(b) evidence: intent and the absence of mistake.  *See* Brief of Appellee at 38.  Neither justification suffices.

*Intent*

An "other act" is relevant to intent when that act "required the same intent as the offense[ ] charged."  *United States v. Guerrero*, 650 F.2d 728, 734 (5th Cir.

12

Unit A 1981)[2]; *see United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) ("[T]he relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses."). The rationale is that if "the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." *Beechum*, 582 F.2d at 911. But to understand whether two acts have the same intent, we must define the "intent" at issue. In Watson's case, the United States tells us that it is the "intent to smuggle aliens." *See, e.g.*, 8 U.S.C. §§ 1324(a)(2) (punishing "[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien"), 1327; *see also United States v. Dominguez*, 661 F.3d 1051, 1068 (11th Cir. 2011) (holding that § 1324(a)(2) requires the mens rea of "knowingly bring[ing] an alien to the United States"). Watson agrees on this point. Consequently, Watson's previous act—being stranded on a boat without a good excuse—must have required the intent to smuggle illegal immigrants to be admissible 404(b) evidence.

---

[2] All former Fifth Circuit decisions issued prior to the close of business on October 1, 1981, are binding precedent on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

13

The act of being found abandoned at sea, combined with a fishy fishing story, does not exhibit the intent to smuggle illegal immigrants. No evidence shows that Watson dropped off anyone in the United States or anywhere else on that trip. Indeed, nothing suggests that another individual was ever on the boat in August 2013. Moreover, there is absolutely no evidence, besides Watson's own testimony, of what he was doing at sea in August 2013 or whether he was going to or coming from the United States. Accordingly, the evidence of the Coast Guard's discovery of Watson at sea in August 2013 sheds no light on his intent on that trip (besides fishing) and comes nowhere close to showing that his intent was to smuggle illegal immigrants.

Our previous case law supports this result. For example, in *United States v. Ramirez*, the defendant, Angulo-Quinones, was convicted of possessing cocaine on a vessel with the ultimate intent to distribute that cocaine. 426 F.3d 1344 (11th Cir. 2005) (per curiam). In 2003, the United States Navy observed Angulo-Quinones and others on a "go-fast boat" off the coast of Colombia. When the Navy approached, the defendants set fire to the boat and jumped in the ocean. Several packages containing cocaine were recovered and the defendant was arrested. *Id.* at 1348. At trial, the United States sought to admit evidence of Angulo-Quinones' earlier arrest in 2000. *Id.* The facts of that arrest were eerily similar to the acts related to his charged offense: he was traveling in a go-fast boat

14

off the coast of Colombia, and when law enforcement officials discovered him, Angulo-Quinones was stranded in the boat with a large amount of cocaine "floating in the water." *Id.* at 1348, 1354. The United States sought to introduce the evidence to show intent, knowledge, planning, preparation and absence of accident or mistake. *Id.* at 1348. The court concluded that the evidence was relevant to Angulo-Quinones' knowledge of go-fast boats and to show that Angulo-Quinones knew a codefendant (who was also picked up in the ocean on the same day in 2000). Further, the court held that the evidence was probative of his criminal intent because "[t]he similarity of circumstances in which Angulo-Quinones found himself, apprehended off the Colombian coast in a flagless, go-fast boat surrounded by large quantities of cocaine is highly probative of his criminal intent." *Id.* at 1354.

The obvious difference between Watson's situation and *Ramirez* is that Watson's prior act was dissimilar from his charged conduct at trial. When Watson was found in August 2013, no undocumented individuals were on the boat, nor was there any suggestion that the boat had dropped off any passengers. By contrast, when Angulo-Quinones was discovered the first time, his boat had *cocaine* around it. No similar evidence connects Watson's August 2013 incident to the smuggling of undocumented immigrants. *Cf. Dominguez*, 661 F.3d at 1073 (holding that a

15

previous incident of *an actual smuggling* was admissible to establish intent to smuggle).

The fallacy of the government's theory is evident by looking at the breadth of crimes for which Watson's incident would, under the government's position, be admissible 404(b) evidence.  Consider a case where Watson is instead arrested for smuggling cocaine, not illegal immigrants, using his boat.  Law enforcement observes him in the boat with a powdery white substance but is unable to recover the substance.  Watson says he was just carrying baking powder.  Under the government's 404(b) theory, the August 2013 episode (being stranded in the middle of the ocean) would be admissible at his drug-smuggling trial to show intent.  Why?  Because the crux of the United States' argument is that Watson's suspicious story in August 2013 makes any future defense story unbelievable.  In the cocaine example, Watson's August 2013 incident would, according to the government, show that Watson was lying about the baking-powder story.  And the potential uses of the evidence would not stop at drug crimes:  the August 2013 rescue would be admissible, applying the same logic, if Watson had been arrested for dumping toxic waste from his boat and asserted that he was returning some fish he caught.  There, the August 2013 incident would show that his returning-fish-to-the-sea story was fabricated.  Dumping toxic waste, transporting drugs, and smuggling illegal immigrants all have different mental states, but, under the

16

government's reasoning, the events in August 2013 had the "same mental state" as each of those crimes. Instead, what these examples demonstrate is that the August 2013 incident is not relevant to intent, but rather goes directly to Watson's character—because Watson allegedly lied once, he is likely to lie again. *See United States v. Young*, 39 F.3d 1561, 1573 (11th Cir. 1994) ("Evidence that the Youngs made alcohol [illegally] thus was not probative of their intent to engage in a conspiracy to possess and distribute marijuana, and any inference that could be drawn from the introduction of this evidence was precisely that which Rule 404(b) was designed to prohibit."). As such, the evidence was not admissible under an intent theory.

*Absence of Mistake*

The United States also argues absence of mistake as alternative grounds to admit the evidence. Evidence showing absence of mistake is admissible to reveal that the defendant's defense of a mistake (such as mistakenly possessing a weapon) is untrue. *See United States v. Jernigan*, 341 F.3d 1273, 1281 (11th Cir. 2003). So, for example, if a defendant says he "made a mistake and did not know he had to declare" firearms at the border, the fact that he had a previous shipment of firearms to Russia intercepted by law enforcement was admissible to show that he did not accidentally omit declaring the firearms. *United States v. Seregin*, 568 F. App'x 711, 716 (11th Cir. 2014) (per curiam). Here, however, Watson never

17

asserted he made a mistake.  Accordingly, absence of mistake does not support the admission of Watson's August 2013 voyage.  *Cf. United States v. Cantrell*, 516 F. App'x 847, 848 (11th Cir. 2013) (per curiam) ("[The jury] could only use the evidence for the limited purposes of determining . . . *whether the acts were committed by accident or mistake*." (emphasis added)).

*Harmless Error*

Even though the admission of the 404(b) evidence was in error, our task is not done.  The next inquiry is whether the district court's decision was harmless.  An error is harmless if it had "no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."  *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999) (quoting *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992)); *United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010) ("Reversal is warranted only if the error resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." (internal quotation marks and alterations omitted)); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

The United States bears the burden of showing that a district court's erroneous evidentiary ruling did not substantially affect the jury's verdict.  *United*

18

*States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009) (per curiam). In this case, no mention of harmlessness graces the United States' brief. And this usually forfeits an issue because parties have the responsibility to bring up arguments and expose them to testing from their adversaries. *See United States v. Cronic*, 466 U.S. 648, 655 (1984) ("'[T]ruth,' Lord Eldon said, 'is best discovered by powerful statements on both sides of the question.'" (citations omitted)).

The court, however, did raise the issue at oral argument and offered both sides ample opportunity to discuss whether the error was harmless. And even had we not, we may raise harmless error *sua sponte* where the harmlessness is sufficiently obvious. *See, e.g.*, *United States v. Adams*, 1 F.3d 1566, 1575–76 (11th Cir. 1993). Otherwise, we would expose the public to further costs and delay associated with a retrial where the outcome would be no different. *United States v. Giovannetti*, 928 F.2d 225, 226–27 (7th Cir. 1991) (per curiam).

In this case, we exercise harmless error review for two reasons: (1) the Court raised the issue at argument, providing both sides with ample time to argue their positions; and (2) the overwhelming evidence demonstrates the error was harmless. Three law enforcement agents testified that Watson confessed that he was offered $20,000 (which he negotiated up to $25,000) to transport illegal immigrants from the Bahamas to the United States. According to each agent's testimony, Watson revealed that he accepted the job—to smuggle illegal

immigrants—because of his children's medical issues. While Watson denied that he confessed, he did confirm that his children suffered from medical problems. And Donovan Morgan, an illegal immigrant on the boat, corroborated the agents' account of the purpose of the trip. He testified that he paid money to be taken to the United States and that was the reason he was on Watson's boat. The circumstances surrounding Watson's capture by the Coast Guard also support his conviction. Watson piloted an overcrowded boat without navigational lights at a high rate of speed, all while traveling in the direction of the United States. When approached by the Coast Guard, Watson fled, in what Morgan described as a "chase."

Further, the "404(b) evidence" played a minor and insignificant role in the trial. After the prosecution introduced the evidence through Lieutenant David Kelley, the district court gave the jury a limiting instruction, explaining that the evidence could be considered only for limited purposes (such as intent) and not to determine whether Watson committed the charged offenses. The United States did not bring up the evidence in its opening argument and mentioned it only in passing in closing argument, and then only to show Watson's familiarity with the immigration process. At no point in the trial did the United States use the evidence as proof of Watson's character or to show that he had previously smuggled illegal immigrants. Instead, it relied on the power of Watson's confession and eyewitness

20

testimony to establish his guilt for the charged offenses.  The overwhelming inculpatory evidence demonstrates that the admission of the 404(b) evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Phaknikone*, 605 F.3d at 1109 (citations omitted).  As a result, reversal is not warranted.

### C.    I-213 Forms

Watson next contends that the I-213 forms should not have been admitted.  The I-213 form records an individual's "routine biographical information," such as "name, date of birth, place of birth, parents' names, height, weight, address, country of citizenship, and information concerning whether the entrant had an immigration visa."  *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010).  Agent John Solek testified at trial that the I-213 form is "a basic Border Patrol arrest form."

According to Watson, the I-213 forms were testimonial hearsay.  As such, Watson says, the admission of those forms violated both his Confrontation Clause rights and the rules of evidence because the United States did not demonstrate that the declarants were unavailable to testify.  Watson objected to the forms only on hearsay grounds at trial, and so we review his Confrontation Clause argument for plain error.  *See United States v. Arbolaez*, 450 F.3d 1283, 1291 & n.8 (11th Cir. 2006).  Watson, however, does not frame his constitutional argument under the

21

plain-error standards. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that the defendant bears the burden under plain-error review). And, as Watson acknowledges, *Caraballo* held that the I-213 forms are admissible hearsay and their admission does not violate the Confrontation Clause. 595 F.3d at 1226–27. Given on-point precedent and the absence of any plain-error argument from Watson, the district court's admission of the I-213 forms was not plain error. As to Watson's Federal Rule of Evidence objection, his argument is foreclosed by *Caraballo*.

### D.    District Court's Limitation of Cross Examination

Watson challenges the district court's limitation of his cross-examination of two witnesses: Donovan Morgan and Agent Malone. According to Watson, the district court excluded relevant evidence and violated his right to confront witnesses guaranteed by the Sixth Amendment.

Federal Rule of Evidence 611(b) grants district courts "broad discretion . . . to determine the permissible scope of cross-examination." *United States v. Jones*, 913 F.2d 1552, 1564 (11th Cir. 1990). Accordingly, the district court's decision to tailor the scope of cross examination may not be reversed absent a clear abuse of discretion. *Id.* But the district court must comply with the Confrontation Clause of the Sixth Amendment, which includes the defendant's cross-examination of witnesses. *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992)

22

(concluding that the district court's discretion "is somewhat narrower where the district court limits a defendant's right to cross-examine witnesses against him"). The Sixth Amendment ensures the defendant a "sufficient cross-examination," but not an unlimited one. *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994). In assessing a Confrontation Clause challenge to cross-examination, courts look to "whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.* at 1539–40 (internal quotation marks omitted).

As to the cross-examination of Morgan, Watson takes issue with the court's refusal to allow two questions: (1) whether Morgan had any receipts from the money his family and friends sent through Western Union and (2) how Morgan got the money. Morgan testified that he received $10,000 from family and friends in Jamaica, which he used to attempt to illegally enter the United States on Watson's boat. On cross, he testified that he received the money from remittances, "like Western Union." After Morgan stated that his family and friends sent money "a lot," counsel asked whether Morgan had "any of the receipts from when they sent you this money." The United States objected on the basis of relevance, and the district court sustained the objection. Then, after asking several other questions, counsel again asked Morgan how he "g[o]t the money from [his] friends in

23

Jamaica and [his] friends from abroad?" The district court also sustained the United States' objection to that question.

Under both the Confrontation Clause and the Federal Rules of Evidence, the district court properly limited the cross-examination. Whether Morgan kept the receipts is not "highly relevant" to Morgan's credibility, as Watson asserts. If Morgan had answered "No, I do not have the receipts," a reasonable jury would not have reached a "significantly different impression" of Morgan's credibility. *Diaz*, 26 F.3d at 1539–40. It is not unusual for people to discard receipts—think of trips to the ATM or gas station where one instinctively hits "No" to the prompt "Would you like your receipt?" Indeed, a reasonable jury might have found it unusual *had* Morgan kept all the receipts from the many times his family and friends sent money—especially when he was using the money for illegal purposes. Moreover, Watson's counsel had sufficient opportunity to expose Morgan's potential biases or credibility issues, such as his cooperation with the prosecution. Accordingly, the district court's ruling was not an abuse of discretion.

Likewise, the second question excluded by the district court—"how did you get the money from your friends in Jamaica and your friends from abroad?"—had already been asked and answered on cross examination. Indeed, knowing that Morgan received the money from Western Union is how counsel ended up asking about the receipts. Questioning Morgan a second time about the source of the

24

money served no purpose and was cumulative.  Neither the Confrontation Clause nor the Rules of Evidence require the presentation of cumulative testimony.

Watson also contends that the district court should have permitted questioning of Agent Malone regarding Miguel Angel Valdez, an illegal immigrant on Watson's vessel.  Watson sought to impeach Valdez—who did not testify—through Malone's testimony.  The basis for allowing this line of inquiry, according to Watson, is Federal Rule of Evidence 806, which allows impeachment of a hearsay declarant's credibility.  *See* Fed. R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked . . . .").  The proposed question was whether Malone knew that Valdez had "15 aliases and two federal convictions."  The prosecution objected at trial, and the district court sustained the objection.

Watson argues that impeachment was appropriate because two portions of the trial testimony are hearsay from Valdez.  First, Malone testified that Watson's "nightcap" story did not "match up" to what Valdez told Malone.  Watson contends that Malone relied on "implicit hearsay" from Valdez in identifying the inconsistency between the two stories.  Malone, however, never repeated what Valdez said and the United States did not introduce any hearsay statements from Valdez regarding Watson's nightcap defense.  Moreover, Malone did not rely on Valdez's statement for the truth of the matter asserted.  Malone testified only that

25

the two statements did not match—he never described Valdez's underlying statement as the correct or truthful version as between Watson's and Valdez's statements.  Because no hearsay statement from Valdez was admitted in evidence, Rule 806 did not allow Watson to attack the credibility of Valdez on the basis of "implicit hearsay."  *See also* Advisory Committee Notes on Fed. R. Evid. 806 ("The declarant of a hearsay statement *which is admitted in evidence* is in effect a witness." (emphasis added)).

Second, Watson contends that Valdez's  I-213 immigration form, prepared by the Border Patrol agents, contained hearsay statements from Valdez establishing his inadmissibility.  The statements on Valdez's form are statements Valdez made to the government agents about his biographical information.  According to Watson, impeaching Valdez's credibility was relevant because it would have undermined Valdez's biographical statements.

Even though Valdez's hearsay was admitted through the I-213 form, *see Caraballo*, 595 F.3d at 1226, his credibility was irrelevant to the issue at hand: whether Valdez could legally enter the United States.  The relevant element of the charged offense requires that Watson knew that Valdez was inadmissible.  *See United States v. Lopez*, 590 F.3d 1238, 1254 (11th Cir. 2009).  Agent Solek testified that Valdez, while operating under the alias Juan B. Molallanos, was convicted of conspiracy to violate federal narcotics laws in 1999 and removed.  As

26

a result of that conviction, Valdez could never reenter the United States. Valdez then illegally reentered the United States and was removed in 2007. Through this testimony about Valdez's prior convictions and removals, the United States established that Valdez was inadmissible. Valdez's credibility on his I-213 form had no bearing on that evidence.

Furthermore, the information Watson sought to elicit from Malone regarding Valdez had already come out at trial. During Agent Solek's direct examination, Solek testified that Valdez had "15 different aliases." Solek also stated that Valdez had a conviction for conspiracy to violate federal narcotics law, as well as a subsequent conviction for illegal reentry. Having Malone repeat the same information would have been cumulative. As a result, the district court did not abuse its discretion in excluding Watson's question regarding Valdez's criminal history.

### E.    Lieutenant Belcher's Testimony on the Contiguous Zone

Watson also appeals the district court's ruling permitting Lieutenant Belcher to testify that a vessel "crossing the contiguous zone line heading towards the [United States] . . . [has] intent to enter" the United States. Belcher's testimony, Watson says, impermissibly stated a legal conclusion. Watson cites to Federal Rule of Evidence 704(b), but that section of the Rule applies only to *expert witnesses*, not fact witnesses. Fed R. Evid. 704(b) ("In a criminal case, an expert

27

witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."). Belcher was not an expert witness. Consequently, Rule 704(b) is not the pertinent section. Instead, the default rule articulated in Rule 704(a) governs. Under that section, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a); *see also United States v. Goodman*, 633 F.3d 963, 968 (10th Cir. 2011) ("The Federal Rules of Evidence do not . . . categorically prohibit lay witnesses from offering opinion testimony regarding the defendant's mental state."). Watson does not argue that Belcher's testimony was impermissible lay opinion under Rule 701. *See* Fed. R. Evid. 701 (stating that a lay witness's opinion may "not [be] based on scientific, technical or other specialized knowledge"). But even if there was error, the admission of the testimony was harmless. The three agents testified that Watson confessed that he was bringing his passengers to the United States, Morgan testified that he had paid to come to the United States, and the circumstances of Watson's "nightcap"— traveling at a high rate of speed, without lights, and attempting to evade capture by the Coast Guard—all provide a more than adequate basis for a jury to find that Watson's intent was to bring illegal immigrants to the United States. Accordingly, Lieutenant Belcher's testimony was not reversible error.

28

### F.    Lieutenant Kelley's Unsworn Testimony

The parties agree that Lieutenant Kelley was never sworn in as a witness. The trial transcript affirmatively states "Witness was not sworn."  Watson did not object at trial and neither the United States nor the district court noticed the error. On appeal, the United States relies on binding precedent holding that a defendant's failure to object to an unsworn witness at trial is an affirmative waiver precluding the defendant from asserting the error on appeal.  *See United States v. Perez*, 651 F.2d 268, 272–73 (5th Cir. Unit A 1981).  Watson replies that we have implicitly overruled *Perez* in *United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007) (en banc).  *Lewis* distinguished waiver and forfeiture in light of the Supreme Court's decision in *Olano*: "a waiver is the intentional relinquishment of a known right, whereas the simple failure to assert a right, without any affirmative steps to voluntarily waive the claim, is a forfeiture to be reviewed under the plain error standard embodied in [Federal] Rule [of Criminal Procedure] 52(b)."  *Id.* at 1222.

Even if we review Watson's objection under plain error, Watson does not satisfy his burden.  An error is reversible under plain error when (1) there was an error, (2) which was plain, and (3) affected the defendant's substantial rights.  *Id.* If those three factors are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (internal quotation

29

marks omitted). Watson contends that the failure to swear-in Lieutenant Kelley was a structural error requiring automatic reversal, without a showing of the last two plain-error elements. Whether structural error modifies a defendant's burden to satisfy all four plain-error factors remains an open question. *See United States v. Smith*, 433 F. App'x 847, 851 (11th Cir. 2011) (per curiam) ("[T]he Supreme Court has expressly reserved the question of whether a structural error alleviates a defendant's burden to show prejudice under plain error review." (citing *United States v. Marcus*, 130 S. Ct. 2159, 2164–65 (2010))). Even if structural error did alter that inquiry, Watson cites no cases holding that the failure to swear a witness rises to that level, nor does he attempt to analogize to any of the "very limited class of cases" where the Supreme Court has found structural errors. *Johnson v. United States*, 520 U.S. 461, 468–69 (1997). According to Watson, unsworn testimony "inherently undermines the integrity and legitimacy of the conviction." Reply Brief of Appellant at 20. That is not the appropriate test. Rather, the inquiry looks at whether the defect "def[ies] harmless-error standards" because it "affec[t][s] the framework within which the trial proceeds, and [is] not simply an error in the trial process itself." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (internal quotation marks omitted). That is, the question of structural error focuses on "the difficulty of assessing the effect of the error." *Id.* at 149 n.4.

30

Watson provides no analysis under that framework.  Without any development to support his claim, we reject his argument that Lieutenant Kelley's unsworn testimony amounted to structural error.  Even if we analyzed his argument on the merits, the presence of unsworn testimony does not amount to a structural defect.  Courts can readily determine the effect of such an error through harmless-error analysis.  For example, the court may look at the strength of the evidence from the sworn witnesses to determine whether the error was harmless.  Unlike structural errors, which "pervade[ ] the entire trial," the error emanating from an unsworn witness's testimony may be much more limited, as it was here.  *Id.* at 150; *cf. id.* at 149 (citing cases involving structural errors, including the denial of the right to counsel, the denial of the right to self-representation, the denial of the right to a public trial, and the denial of the right to a jury trial as a result of a defective reasonable doubt-instruction).  Indeed, no one even noticed the lack of an oath—including probably the witness.  Because the error was not structural and Watson does not argue that the remaining plain-error factors are satisfied, the unsworn testimony does not require reversal.

## G.    Deliberate Ignorance Instruction

As part of the jury charge, the district court instructed the jury on deliberate ignorance.  The court stated, in relevant part, that the jury could find that Watson had knowledge that each of his passengers' entry to the United States would be

31

illegal if he either had actual knowledge or if he "believe[d] the alien's entry into the United States would be illegal, but deliberately and consciously avoid[ed] learning of the alien's nationality or legal status so that he c[ould] deny knowledge."

Our review of the deliberate ignorance instruction is for plain error, as Watson did not object to the instruction at trial. *See Lewis*, 492 F.3d at 1222. "A deliberate ignorance instruction is appropriate when the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Perez-Tosta*, 36 F.3d 1552, 1564 (11th Cir. 1994) (internal quotation marks omitted). If, however, the evidence "only points to either actual knowledge or no knowledge on the part of the defendant," a deliberate ignorance instruction is inappropriate. *United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997); *see United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1992) ("In determining whether a deliberate ignorance instruction is proper in a particular case, we have held that it must be based upon facts which would point in the direction of deliberate ignorance." (internal quotation marks omitted)).

Even assuming there was error that was plain, Watson cannot demonstrate that the error affected his "substantial rights." In the "ordinary case," an error

32

impacts a defendant's substantial rights when that error "affected the outcome of the district court proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation omitted). Any error from the instruction had no effect on the proceedings because the evidence at trial supported a finding that Watson actually knew that his passengers could not legally enter the United States. All the individuals on the boat were inadmissible to enter the United States. More importantly, the three agents testified that Watson knowingly accepted money to transport illegal immigrants to the United States. From that testimony, a reasonable jury could find that Watson had actual knowledge that the individuals in his boat were illegal immigrants. The district court instructed the jury as to actual knowledge as well as deliberate ignorance. As the jury could have reasonably found that Watson had actual knowledge, any error with regard to deliberate ignorance did not affect his substantial rights. *Cf. Rivera*, 944 F.2d at 1572 ("[B]ecause the jury was also instructed that it could convict based on a theory of actual knowledge, any error is harmless if there was sufficient evidence to support the convictions under that theory.").[3]

---

[3] Watson contends that cumulative error requires reversal. Because only one error, the admission of the 404(b) evidence, occurred at trial, there "can be no cumulative error." *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004) (quoting *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)).

33

## II.    Sentencing Challenges

Watson makes several arguments as to his sentence:  (1) the district court's two-level enhancement for substantial risk of bodily injury or death was unwarranted; (2) the sentence was substantively unreasonable; (3) the sentence was unconstitutional insofar as it punished Watson's decision to testify at trial; and (4) the sentence was an impermissible general sentence.  In reviewing the district court's imposition of a sentence, "[w]e accept the district court's factual findings at sentencing unless clearly erroneous, and we review the application of the Sentencing Guidelines to the facts *de novo*."  *Caraballo*, 595 F.3d at 1230.

The district court properly applied a two-level enhancement because "the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person."  U.S.S.G. § 2L1.1(b)(6); *id.* cmt. n.5 ("Reckless conduct to which the adjustment from subsection (b)(6) applies includes . . . carrying substantially more passengers than the rated capacity of a motor vehicle or vessel . . . .").  Watson piloted an overcrowded vessel at a high rate of speed, at night, without any navigational lights on, and then attempted to evade the Coast Guard.  That conduct is sufficient to warrant the two-level enhancement.  *See United States v. Gonzalez*, 394 F. App'x 570, 575 (11th Cir. 2010) (holding that district court did not clearly err in giving two-level enhancement for similar conduct); *United States v. Fuentes-Nodarse*, No. 14–

34

11723, 2015 WL 669971, at *3 (11th Cir. Feb. 18, 2015) (per curiam) ("We agree with the district court's conclusion that an enhancement under § 2L1.1(b)(6) applies where the boat used to smuggle aliens traveled on the open seas, at night, at a high rate of speed and without navigation lights, especially when that boat employs evasive maneuvers and intentionally strikes another vessel.").

The 151-month sentence was also substantively reasonable. Ordinarily, we expect that a sentence "impose[d] . . . within the advisory Guidelines range . . . [is] a reasonable one." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (internal quotation marks omitted). Here, the term of imprisonment fell within the Guidelines range, even if at the top of that range. Further, we also assess reasonableness by comparing the sentence given to the maximum possible sentence. *See United States v. Winingear*, 422 F.3d 1241, 1246 (11th Cir. 2005) (per curiam). Because the statutory maximum on each count of conviction was ten years, Watson faced up to a total of 50 years in prison. *United States v. Mastantuono*, 306 F. App'x 538, 541 (11th Cir. 2009) (per curiam) (comparing sentence imposed to maximum sentence if counts ran consecutively); *United States v. Lake*, 285 F. App'x 735, 736 & n.5 (11th Cir. 2008) (per curiam) (same). Watson's sentence of about twelve and a half years was well below the total aggregated statutory maximum sentence of 50 years. For those reasons, Watson's sentence was reasonable.

35

Next, Watson contends that his sentence was unconstitutional because it punished his exercise of his Fifth and Sixth Amendment rights to a trial, pointing to the obstruction-of-justice enhancement to his sentence and the fact that he did not receive the three-level reduction for acceptance of responsibility. That argument has no merit. The obstruction-of-justice enhancement does not unconstitutionally affect the right to testify. *See United States v. Dunnigan*, 507 U.S. 87, 96 (1993) ("Respondent cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury."). The enhancement is appropriate so long as the district court "makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Id.* at 95. Contrary to Watson's assertions, neither a perjury indictment nor conviction is necessary. Watson does not challenge the district court's factual findings here. Consequently, we affirm the obstruction-of-justice enhancement. Similarly, no constitutional violation occurred when Watson did not receive the three-level reduction for acceptance of responsibility because he never pled guilty. *See United States v. Henry*, 883 F.2d 1010, 1010–11 (11th Cir. 1989) (per curiam) (rejecting an argument like Watson's).

36

Watson's next two arguments require a partial remand.  First, the case must be remanded to fix a clerical error.  The judgment states that Watson received a 150-month sentence on each of Counts 1, 3, 8, and 9, to be served concurrently, and a one-month sentence on Count 10, to be served consecutively to the 150-month sentence.  The district court's statements at the sentencing hearing, however, imposed a 151-month sentence on each of Counts 1, 3, 8, and 9, to be served concurrently, and a one-month sentence on Count 10, also to be served concurrently.  A limited remand is needed to correct that error in the judgment.

A limited remand is also necessary to address the general sentence imposed by the district court.  General sentences are per se illegal in this Circuit.  *See United States v. Moriarty*, 429 F.3d 1012, 1025 (11th Cir. 2005).  "A general sentence is an undivided sentence for more than one count that does not exceed the maximum possible aggregate sentence for all the counts but does exceed the maximum allowable sentence on one of the counts."  *Jones v. United States*, 224 F.3d 1251, 1259 (11th Cir. 2000) (quoting *United States v. Woodard*, 938 F.2d 1255, 1256 (11th Cir. 1991) (per curiam)).  One hundred fifty-one months exceeds the permissible statutory maximum of ten years on each of Counts 1, 3, 8, and 9.  *See* 8 U.S.C. §§ 1324(a)(1)(A)(iv), (v)(I), 1324(a)(1) (B)(i), 1324(a)(2)(B)(ii), 1327.  Because 151 months is a permissible aggregate sentence, but an

37

impermissible sentence on any individual count, we remand for the district court to clarify the distribution of the sentence across the counts.

We affirm Watson's convictions, but vacate the sentence and remand for the limited purpose of clarifying the sentence.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**.